69  259
81  335
69  259
84  638

## William H. Stevens v. Virgil M. Rose.

*Lease —Life tenant—Impeachment for waste—Presumption in support of findings of jury.*

1. Where the record does not purport to set out all of the evidence given on the trial, it will be presumed that evidence was given to support the findings of the jury in answer to special questions submitted to them, and the party propounding same will be bound by their answers.

2. Where a son gave his father a lease of certain lands " to use and control as the father thought proper, for his benefit during his natural life," both parties remaining in possession, and a building was erected on the land by the joint labor of the son and third parties, with the knowledge of the father, under an agreement with the son that it was to remain a permanent structure for the benefit of the son's estate, it became a part of the freehold, and could not be removed by the father, or sold, unless he possessed such rights of sale or removal under his lease.

3. A lease of land, " to have and to hold, and to use and control as the lessee thinks proper, for his benefit during his natural life," gives to the tenant the right to do all those acts which a leasing " without impeachment for waste " confers upon a life tenant.

4. Tenants for life, not made unimpeachable for waste by the lessor, are liable for both commissive and permissive waste.

5. The real intention of the clause, "without impeachment for waste," is to enable the tenant to do many things, such as cutting wood, opening new mines, etc., which would otherwise at the common law amount to waste; but these words do not operate as a license to the tenant to destroy the estate, or to commit malicious waste, such as cutting down fruit-bearing trees, or trees which serve for shade or ornament.

Error to Oakland. (Stickney, J.) Argued February 10, 1888. Decided April 6, 1888.

Action on the case for waste. Defendant brings error. Affirmed. The facts are stated in the opinion.

*Baldwin, Draper & Jacokes,* for appellant.

*Fremont Woodruff* and *Aaron Perry,* for plaintiff.

LONG, J. This action is brought under chapter 271, How. Stat., entitled "Of Waste."

Section 1 of that chapter provides:

"If any guardian, or any tenant by the courtesy, tenant in dower, or for term of life or years, or the assigns of any such tenant, shall commit or suffer any waste during their several terms or estates, of the houses, gardens, orchards, lands or woods, or of any other thing belonging to the tenements so held, without having a lawful license in writing so to do, they shall respectively be liable to an action on the case for such waste."

In April, 1870, the defendant was the owner of the land described in the declaration. On the sixteenth day of April in that year, by warranty deed, he conveyed it to his son Clark Rose, and on August 25, 1870, Clark Rose gave defendant a life-lease in words following:

" This indenture, made the twenty-fifth day of August, in the year 1870, between Clark Rose, of the town of Royal Oak, county of Oakland, and State of Michigan, of the first

part, and Virgil M. Rose, of the same place aforesaid, of the second part, witnesseth: .

"That the party of the first part, for and in consideration of the sum of five hundred dollars to him in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, has leased unto the said party of the second part the following described piece or parcel of land, to wit: The east half of the north-east quarter of section 28, except the hotel-stand on the north-east corner, and all the west half of the north-west quarter of section 27, lying on the west side of Saginaw turnpike, and the south half of the west half of the south-east quarter of section 22, all in town 1 north, of range 11 east; to have and to hold, to use and control as he thinks proper, for his benefit during his natural life."

January 20, 1881, Clark Rose and wife made, executed, and delivered to John F. Northrup a mortgage on said premises for $3,000, which mortgage was afterwards assigned by. Northrup to the plaintiff; and on September 16, 1882, Clark Rose and wife made, executed, and delivered to plaintiff another mortgage on said premises for the sum of $2,000. These two mortgages were subsequently foreclosed in chancery, and the premises under said sale purchased by plaintiff, who became the owner in fee of the same, subject to the rights of the defendant under the instrument above set forth.

At the time these two mortgages were given there was a dwelling-house on the premises, situate on the southerly side of the Saginaw turnpike, and a barn, westerly from the dwelling-house, and westerly from the barn were about fourteen oak trees that had been left standing when the land was cleared, and were so left in the field for the purpose of ornament and shade, and were situated in a small field or yard, seeded down, and used in connection with the farm buildings as a stock pen or yard.

It also appeared that the land described in the life-lease above set forth as the "south half of the west half of the south-east quarter of section 22," was situate about two miles

from the dwelling-house on the premises, and was covered
with an abundant growth of timber for fire-wood and fencing.

In October, 1879, Boyd & Peters erected on the premises
a building for an animal shed, and evidence was given on the
trial tending to show that they erected it under a contract
with Clark Rose for the purpose of keeping and caring for
the animals of a menagerie owned by the former during the
winter of 1879 and 1880, and under an arrangement that the
former were to use it for that purpose as long as they wanted,
and, after they were through with it, then it should belong
to Clark Rose. It was put up by Clark Rose and the men of
Boyd & Peters, and stood near the highway, forming a part
of the highway fence. It was boarded up and down, and
then ceiled up from the bottom 10 feet or more, and filled in
with sawdust. There was a flooring overhead, and the upper
part was used as a harness room. The frame was rather a
temporary affair, though made of large timbers.

The consideration of the building being the property of
Rose after it was no longer needed for the purpose for which
it was constructed was that Boyd & Peters were to have the
use of all the other barns, sheds, and hay-lofts on the farm
during the winter, and of a dwelling-house in the village.
It was used one winter, and vacated by the parties the follow-
ing May. After that, it was used and controlled by Clark
Rose, while he lived on the place, for the purpose of storing
farm implements, wagons, etc., and was worth from $150
to $200, and at the time it was built was to remain perma-
nently on the place, and was not erected as a mere temporary
affair.

Evidence was also given tending to show that, before the
time plaintiff took the assignment of the Northrup mort-
gage, he visited the premises in question, and then observed
the buildings there; that they had the appearance of being
permanent buildings, and a part of the real estate; and that
Clark Rose and wife were then in possession of said premises,

and continued in possession until after plaintiff acquired title by foreclosure; and that defendant lived across the way on his own farm.

In January, 1885, the defendant took this building down, and removed it, and used the material in the erection of a building upon his own premises; and the defendant also cut down and carried away the 14 oak trees above described. The defendant gave evidence tending to show that the trees cut were decaying oak trees, and that he cut and used them for fire-wood before the time the plaintiff got title under the foreclosure of his mortgages; that the trees were of no use or value except for fire-wood, and that defendant needed the ground to raise crops on, and no injury was done the freehold by cutting and removing them.

The defendant claimed that the building was a temporary structure, and was built, with posts set in the ground, on the land by Boyd & Peters, who first obtained defendant's consent to place the same there, and when they removed from it they owed him, and he purchased it, and applied it upon such indebtedness; that the building was not attached to the freehold, and, when purchased, belonged to and was the personal property of Boyd & Peters; that Clark Rose had nothing to do with its being built, and that Peters valued it at only about $30 or $40.

Some evidence was also given tending to show that the building stood so near the highway that the odor from it frightened the horses passing there, and also that the land where these trees were cut was plowed up, and planted with potatoes, and that their being cut and removed was no injury to the freehold.

The testimony being closed, the defendant's counsel requested the court to charge the jury—

"That, by the terms of the lease, the defendant, Virgil Rose, was a tenant for life of the premises described therein, without impeachment of waste, and, as such, had a lawful

right to do the acts complained of in the plaintiff's declaration; * * * and that the plaintiff is not entitled to recover."

These requests the court refused to give in his charge to the jury. The case was submitted to the jury, who found a general verdict for plaintiff of $90.

The court, by request of defendant's counsel, submitted certain special questions to the jury, which they answered, as follows:

"1. Do you find that the defendant cut down the trees before the twentieth day of January, 1885?
"A. No.
"2. Do you find that the trees cut by the defendant were only fit for fire-wood?
"A. No.
"3. Do you find that the trees cut were necessary for fire-wood for the defendant and his family, and that they were cut and used by him for fire-wood?
"A. No.
"4. Do you find that the building which the defendant removed was erected upon posts, for the purpose of wintering the animals of a menagerie, by Boyd & Peters?
"A. Yes.
"5. Do you find that the defendant purchased the building of those who erected it, and that he had a right to remove it?
"A. No."

The record does not purport to set out all the testimony given on the trial, and we must presume that evidence was given to support the finding so made by the jury, and the defendant must be bound by the answers given to the questions propounded by himself.

The only question for our consideration arises upon the refusal of the court to give in charge to the jury the defendant's requests, and the consideration of this question involves the construction to be given to the words of the life-lease, —

"To have and to hold, to use and control as he thinks proper, for his benefit during his natural life."

The defendant contends, however, that, under the rule established by the courts as between tenant for life or years and reversioner or remainder-man, where all erections by the former for the purposes of trade or manufacture, though fixed to the freehold, are considered as his personal property, and, as such, may be removed by him during his term, this building, erected for keeping wild animals during a winter, was clearly in the way of trade, and defendant, being the owner of the life-estate, and consenting to its erection, had a right to remove it during his tenancy. The trouble with the position now taken by the defendant is that he made no such request for the jury to find. Under the circumstances of this case, the court could not decide, as matter of law, that the building in question was personal property, or in the nature of a trade fixture, erected or bought by defendant.

The defendant, by his special questions for a finding by the jury, submitted to the jury:

" Do you find that the defendant purchased the building of those who erected it, and that he had a right to remove it?"

The jury found the fact against him, and he must be bound by the finding.

The plaintiff testified that, when the mortgages under the foreclosure of which he obtained title were given and purchased, he visited the premises in question, and observed the building there; that the same had the appearance of real estate, and he took said mortgages in good faith believing such building was conveyed, and was a part of the realty, and that the mortgagor was in possession of said building and premises; and, to the time when he bid off the premises on the foreclosure sale, he had no knowledge that the defendant had any claim to such building other than that given by his lease, or that the defendant claimed the right to remove the same.

Under the circumstances of this case, and the finding of

the jury, the plaintiff is in the position of a *bona fide* purchaser for value, and the defendant cannot set up any latent equities, or parol agreements or understandings by which the building was to be personal property, and he have the right to remove it, either as a trade fixture or otherwise, and defendant would be presumed to hold under his record title only. *Adams v. Bradley*, 12 Mich. 346; *Knowlton v. Johnson*, 37 Id. 47; *Van Slyck v. Skinner*, 41 Id. 186 (1 N. W. Rep. 971); *Helmer v. Krolick*, 36 Id. 371; 1 Jones, Mortg. §§ 433, 458.

Some complaint is made of certain portions of the charge of the court. Upon an examination of the whole charge, we are of the opinion that the court very clearly and very correctly stated the law governing the case. The parts of the charge complained of are as follows:

"The question as to whether a building or other erection is a part of the realty, and a fixture, is determined by no fixed rule; neither is the mode of annexation to the soil, nor the manner of its use, in all cases conclusive. It most usually depends upon the express or implied understanding of the parties concerned. The building, you remember, was erected by Boyd & Peters of the circus company. * * * After consultation with Virgil M. Rose, the defendant in the suit, what was the intention of the parties as to the permanency of the construction or structure? To determine this question, you have a right to take into consideration all the testimony, * * * and determine the character of the building; whether, when erected, it became a part of the realty or not."

Defendant's counsel now claim that this was misleading, and that there was no testimony to show that the defendant, who had control of the land from 1870 to the time of the trial, ever consented to have it considered a permanent structure, and that the style of the building and its purposes gave it its character.

As we have before remarked, this record does not purport to contain all the evidence, and we must presume that some

evidence was given in the case upon which the court based this part of his charge; and this part, taken in the light of the whole charge, we do not think was misleading, or that the rights of the defendant were in any manner prejudiced thereby.

The defense made was that the building was personal property, and belonged to Boyd & Peters, who had a right to sell it, and did sell it to defendant, and by reason of this purchase defendant had a right to remove it. This question defendant, by his counsel, submitted to the jury for their finding, and it was against him.

Defendant also complains of the further charge of the court in which the court said:

"If the jury find that the building in question was erected by those who caused it to be built with the intention that it should remain permanently on the land where constructed, or if it was constructed under an arrangement that it so remain, it then became real estate; and no agreement made with defendant afterwards, and not in writing, could convert it into personal property, or authorize Virgil M. Rose to remove the building."

Under the circumstances of this case, we think this charge was warranted. The defendant held the life-lease of the premises above set forth. Clark Rose, his son, was the owner of the remainder in fee, and was in possession, with defendant, of the premises. The building was erected by the joint labor of Clark Rose and Boyd & Peters, and presumably with the full knowledge and consent of defendant. The testimony tends to show that it was erected under an agreement with Clark Rose that it was to remain a permanent structure, and to be of benefit to his estate in remainder. The defendant claimed it was erected under an understanding with him, and was not to be permanent, and he subsequently purchased it as personalty; and it therefore became a question of fact for the jury whether, when built, it was the intention that it should remain permanently on the land, or was a mere tem-

porary affair, and not in any way connected to, or become part of, the freehold. If it was the intention when erected to make it part of the freehold, and it did so become, then Virgil M. Rose, the defendant, could not remove it, or convey any title to it, unless he had such right by the terms of his lease. *Wheeler v. Bedell,* 40 Mich. 693; *Ferris v. Quimby,* 41 Id. 202 (2 N. W. Rep. 9); *Morrison v. Berry,* 42 Id. 389 (4 N. W. Rep. 731).

It is claimed by the defendant that whether the defendant had a right or not to remove the building, as an ordinary tenant, during his tenancy, he had such right under his life-lease; that the clause, " to have and to hold, to use and control as he thinks proper, during his natural life," removes all restrictions, so far as any of the acts indicated by the record are concerned; that the words, " to have and to hold," gave him certain legal rights in the land that were well known and well guarded, and by which he had his fire-wood, necessary timber for repairs, the full use of all the arable and pasture land, and his administrator was entitled to the usual growing crops if the tenant should die leaving any unharvested crops growing upon the place; that the mere tenant for life, under the words, "to have and to hold," having all these privileges, the addition of the words, "to use and control as he thinks proper," imply the widest authority, removing all limitations to the defendant's use of the leased premises, and have them, and everything upon them, so far as the lease governing the case, in his possession, with all the rights and authority of the owner of the land; and if there be any limitation or restriction that even a court of equity would control, in a lease without impeachment for waste, such restrictions are removed by the language employed here, and that such language is at least of equal force and significance as the words, "without impeachment of waste."

On the other hand, it is contended by counsel for plaintiff that the practice of leasing without impeachment of waste

has not obtained in the United States, and, that being the case, the words used must very clearly import that the tenancy is to be without impeachment of waste, before a court will so construe them.

The action of waste under the old English practice was a remedy given for injury to lands, houses, woods, etc., by a tenant thereof for life or years, to the injury or prejudice of the heir, or of him in the reversion or remainder. It was either voluntary or permissive,—the one by actual design; the other arising from mere negligence, and want of sufficient care. The action was partly founded upon the common law, and partly founded upon the statute of Gloucester, and was a mixed action; real so far as it recovered the realty injured, and personal so far as it covered the damages for the injury. Originally, and under the old practice, the action was brought for both of these specific purposes, and, if waste was proved on the trial, the plaintiff recovered, not only the premises injured, but also the damages he had sustained by reason of the injury.

The action for this double purpose, having fallen into disuse, was finally abolished in England by the statute of 3 & 4 William IV. c. 27. In this country, although adopted in some of the states, it has been but little used; having been, in practice, virtually superseded by the action on the case in the nature of waste for the recovery of damages merely, or by bill in equity. In our own State this action on the case is authorized by chapter 271, How. Stat., above cited. These provisions of our statute on this subject are in accordance with the legal practice which has been adopted, and long since fully established, in England and in this country.

Tenants for life, not made unimpeachable for waste by the person granting the estate, are liable for both commissive and permissive waste. The real intention, however, of the clause, "without impeachment for waste," is to enable the tenant to do many things, such as cutting wood, opening new mines,

etc., which would otherwise at the common law amount to waste; but these words do not operate as a license to the tenant to destroy the estate, or to commit malicious waste, such as cutting down fruit-bearing trees, or trees which serve for shade or ornament. If he is tenant "without impeachment for waste," he has the same right to cut timber, work mines, etc., for his own use, as the owner of the inheritance; but those words do not justify him in demolishing the buildings, or doing that which operates as destructive or malicious waste. Wood, Landl. & Ten. p. 711, § 426; *Leeds v. Anherst,* 14 Sim. 357; *Aston v. Aston,* 1 Ves. Sr. 265; *Vane v. Lord Barnard,* 2 Vern. 738. The words are not to be treated as importing a license to destroy or injure the estate, but to do all reasonable acts, consistent with the preservation of the estate, which otherwise might in law be waste.

If, then, these words in the lease, "to have and to hold, to use and control as he thinks proper, for his benefit during his natural life," be construed as a leasing without impeachment of waste, as defendant's counsel claim they must be, the defendant would have no right to tear down and carry away the buildings erected on the premises, under the circumstances of this case. The life tenant, even under a lease without impeachment for waste, owes a duty to the reversioner or remainder-man to preserve in a reasonable manner the buildings, and all fruit and ornamental trees, on the estate; and he has no right to commit any malicious waste, or to destroy such buildings or trees. While there is no doubt he has a right to cut and take timber for his own use, the same as the owner of the inheritance, yet in this case it was contended by plaintiff, and evidence was offered tending to prove the fact, that these 14 oak trees were left for ornament and shade; and the jury found, under questions put by defendant's counsel, that they were fit for other purposes than fire-wood, and were not necessary to the defendant for such purpose, and thus, in effect, found that they were saved

and kept for the purposes of ornament and shade. There was an abundance of timber only two miles distant from the dwelling of defendant, which was conveyed to him under the same lease, and from this he had a right to cut his fire-wood, and he had a right, also, to cut such other timber as he pleased, if the lease is one without impeachment of waste. These words were inserted in the lease for the purpose, clearly, of giving the tenant some greater rights than an ordinary life tenant. They are words seldom employed in leases, and they must be construed most strongly against the grantor.

In *Goodright v. Barron*, 11 East, 220, a will was executed with this clause:

" Also I give and bequeath to my wife, Elizabeth, whom I likewise make my sole executrix, all and singular my lands, messuages, and tenements, by her freely to be possessed and enjoyed."

In an action of ejectment, Lord Ellenborough, giving the opinion of the court, and speaking of this clause in the will, says:

" But these words may have been meant to make her dispunishable of waste, for which, as tenant for life only, she would have been liable.    *    *    *    If the words 'during her life' had been added, that would have made the intent clear in one way."

In *Webster v. Webster*, 33 N. H. 21, the court say:

" It would seem that no particular form of words is necessary to make an estate for life without impeachment for waste."

We think the words employed in this lease clearly import a leasing without impeachment for waste, and that the defendant has a right to do all those acts which such a tenant may exercise. We, however, find no error in the record, under the circumstances of this case, in view of the character

of the building removed, and the trees cut and carried away. The judgment must be affirmed, with costs.

SHERWOOD, C. J., MORSE and CAMPBELL, JJ., concurred. CHAMPLIN, J., did not sit.