## DAVID TOUSIGNANT v. THE SHAFER IRON COMPANY.

*Contract of employment—Change of masters—Notice—Principal and agent.*

1. In a suit by miners for labor performed after a mining company had contracted with its former agent to take out the ore, proof of the employment of the plaintiffs by the agent for the company for an indefinite time, and at a given rate, prior to the letting of the contract, and of their continuous labor thereunder, and of the balance due them for the labor sued for, makes a *prima facie* case, and casts the burden upon the

company of showing its non-liability by bringing home to the plaintiffs notice or knowledge of the contract.

2. The same rule applies to boarding-house keepers who boarded the miners under an arrangement with the company by which they reported the amount of the board-bills, and the sum was charged up to the boarders in the time-slips given them, and credited to the boarding-house keepers, who relied upon this method, rather than upon the individual responsibility of the boarders.

3. The same rule does not apply in a suit by miners who left the service of the company before the contract for taking out the ore was made, and were re-employed by the agent after he entered upon the performance of his contract, and who only show the nature of such re-employment by the testimony of the agent, who says that he made no contract in the name of the company after such letting to him, but there should be some evidence to repel the natural inference that the agent made the new contract in his own name, and to show that the plaintiffs supposed, at least, that they were dealing with the company, or that they relied upon the apparent authority of the agent, and gave credit to the company.

Error to Iron. (Stone, J.) Argued April 6, 1893. Decided June 16, 1893.

*Assumpsit.* Defendant brings error. Reversed. The facts are stated in the opinion.

*E. E. Osborn,* for appellant.

*Cook & Pelham,* for plaintiff.

McGRATH, J. Plaintiff sues in behalf of himself and some 40 others to recover for labor performed in mining at the Shafer iron mine in June, July, and August, 1891, and for certain board furnished the men, as hereinafter explained.

Defendant began operating the mine in 1889, and continued the mining operations until January 1, 1891, when it let the contract to take out the ore to one Jennings, who had up to that time been its superintendent, and from that time forward Jennings carried on the business of get-

-ting out the ore in his own behalf, and paid the men for the months of January to April, both inclusive. For the month of May defendant paid the men on Jenning's account. Prior to January, 1891, a time slip or check was given to each employé on or about the 1st of each month. These slips were made out on printed blanks having the following caption:

"MONTHLY PAY-ROLL ACCOUNT.

SHAFER MINE.

—————————————————————, No.——

"*In account with Shafer Iron Co.*

"For the month of ———————, 189 .""

Each slip was filled out with the number of days worked, the *per diem*, and the aggregate earnings, from which was deducted the amount for rent, board, doctor, etc., and the balance due the employé was brought down. These checks were given to the men, who kept them until pay-day, which was about the 20th of the month. They were paid, sometimes by Chicago checks, signed by the Shafer Iron Company, at other times by local checks, signed by Jennings, and at other times in currency. No notice was given by the company to the men of any change. Defendant's general manager, one Himrod, and its agent, one Biggers, remained at the mine, and occupied the company's offices. There was in fact no change made in the manner of conducting the business, except that the men were afterwards paid in checks signed by Jennings, or in currency. There was no visible change about the mine, except that at one of the skips a red cardboard, 12 by 20 inches in size, upon which was printed in large black letters the following: "Employés are positively forbidden to ride in the skip. Use ladders. Shafer Iron Co.,"—had been tacked up, and some time after January 1, 1891, several lead-pen-

oil lines had been drawn across the words "Shafer Iron Co.," and the words "E. P. Jennings, Contractor," had been written in pencil underneath. Jennings testified that after January 1, 1891, he had carried on the business of mining the ore in his own name; had opened an account with a bank, and with one or two material-men, in his own name; that he had never pretended from that time forth to do business for the Shafer Iron Company; never made a contract, or tried to make a contract, in the name of the Shafer Iron Company; and that whatever he did he did in his own name. The plaintiff and his assignors had all worked for the company up to January 1, 1891, and most of them continually, until some time in August. A few had not been employed continuously after January 1. Time-checks were issued to the men as before, *upon the same blanks,* and it was upon these checks that defendant, in June, paid the men for May. Jennings was the only witness called for plaintiff.

The court instructed the jury as follows:

"I think the rule of law is, gentlemen, that a person employed by an authorized agent, and set to work, as it is conceded these men were by the undisputed evidence in this case, had a right to suppose that the same condition of things continued to exist after the employment as existed at the time of the employment, unless they had notice to the contrary, or unless there was something in the circumstances surrounding the matter that was equivalent to them of notice. In other words, it seems to the court that the defendant corporation here owed these men who were in its employ at the time it made this contract with Mr. Jennings,—which we will term the change in the way of doing business there,—that at that time the defendant owed its employés there in the mine a duty; that it was the duty of the defendant to have carried particular notice to them; to have brought notice home to them of this change. In other words, the rule, as I understand it, is this (and it is said to be in the books a familiar principle of law): That when one has constituted and accredited another as his agent to carry on business, the authority of

the agent to bind his principal continues even after actual revocation of such authority, until notice of the revocation is given, and, as to persons who have been accustomed to deal with such an agent, until notice of the revocation is brought home to them. And it is said that the case of such an agency is analogous to that of partnership, and the notice of revocation of the agency is governed by the same rules as notice of dissolution of partnership; that is, as to persons who have been previously in the habit of dealing with the firm, it is requisite that actual notice should be brought home to the creditors, or at least that the credit should have been given under circumstances from which notice can be inferred. When notice is sought to be inferred as a fact from circumstances, it becomes a question for the jury.

"The court here thinks this is a question of fact, and submits it to you, and the question is submitted to you as a matter of fact, whether this labor for which this suit is brought was done and performed under such circumstances as would operate as notice, or under such circumstances that it can be said that notice can be inferred on the part of these claimants of this change. If these parties had notice of this change, they cannot recover here, for it is undisputed that a change took place; that the authority of Jennings was revoked, and he entered into an independent contract; and the question here is, did these claimants have notice, or, under the circumstances surrounding them, can you infer from this evidence legitimately that they received notice? So, I say the question is submitted to you as a matter of fact, whether the defendant gave such notice as a prudent man should have given.

"Something has been said here, and evidence has been given, with reference to some board bills. It is claimed on the part of the claimants here that it had been a custom or universal practice at that mine, and it is claimed that there is some evidence to support it, that certain boarding-house keepers had been in the habit of boarding the men, and that at the end of the month the amounts due to the boarding-house keeper from the several men he had boarded were reported to the superintendent or officers of the mine, and that these amounts were deducted from the amounts due the men, and were by the mine paid over to the boarding-house keeper. It is claimed that such was the practice; that it was generally acquiesced in by the men. It is claimed that this continued, after this

change, to be done in the same way it was done before. The court submits that matter to you. Was there a custom or general, universal practice as to the boarding of the men by which the boarding-house keeper had received from the defendant the board of the men,—that is, during the time that this defendant was operating the mine,— and was such course acquiesced in by the defendant and the miners, the men who owed for the board? And it is submitted to you whether the boarding-house keeper, this having been the practice,—had the boarding-house keeper, or any persons whose claims are represented in this suit, received any notice of the change in this business, such as would have led a prudent man to have acted differently? If there had been such custom or universal practice, and no notice had come to the knowledge of the boarding-house keepers, then I think they should recover for the boarding-house claims in this case; but if there had been such a universal practice, or if you shall find that there had been such practice, but that they had received notice of the change, or under the circumstances had notice of the change, then you should not allow these claims."

It was claimed that four men (named) had not worked at the mine during January, February, March, or April, 1891, and one (named) had not worked in January, 1891.

"As I understand it, there is uncontradicted evidence in the case that they were old employés under the prior management, had ceased to work for two or three months there during the time I have mentioned, or three or four months, as the case may be, and came back and resumed work at the mine under Mr. Jennings. Now, should the defendant in this case pay for these men's labor? Counsel for defendant insists that they should not, because they had broken their relations,—they had gone away,—and claims that they came back like new men. I have deemed it my duty, gentlemen, to submit that question to you as to these men, and ask you, as matter of fact, whether, under all the circumstances of the case, these men, having worked there before, having entered the employment again, whether, considering the lapse of time between the prior labor and entering into the work again, considering the time between which the former labor ceased and the change took place between Jennings and the defendant corporation,—I leave it to you to determine whether the prior dealing between

the parties, under the circumstances, were such as to warrant the laborers in believing in the continued existence of the authority of the agent or the superintendent to hire them; as to whether that authority was existing there at the time,—whether the same authority was existing as at the time of the former hiring. If you shall say that they were warranted, under all the circumstances surrounding the case, the lapse of time being taken into consideration, and everything there that the evidence shows that they saw and did there,—that they were warranted in supposing that Jennings continued with the same authority there as agent of the defendant,—then I think you should allow these claims; otherwise, not; they should be rejected."

As to the parties who had been employed by the company, and therefore continued at work at the mine without cessation, the learned judge was undoubtedly correct. These men had been employed by defendant for an indefinite time. No new or other contract of employment was shown to have been made with them. The question was not as to whether Jennings had apparent authority to employ them. As to them, a *prima facie* case was made when they showed an employment by defendant at a given rate; that they continued at work in the same employment; that they had been paid in part, and that a balance was yet unpaid. The burden was then upon defendant to show that it had been in some way released and discharged. The case does not differ from any other case of an executory contract not terminated at the time of the revocation of the agency.

The case is different respecting the operatives who did not continue under the same engagement. The general rule undoubtedly is, as stated by the trial judge, that a former general agent, within the scope of his original authority, notwithstanding its revocation, continues to bind the former principal as to those parties who have been, and are still, dealing with him in good faith, in reliance upon his former authority, until they have notice of its

revocation. Mechem, Ag. § 224. The case is said to be analogous to that of the dissolution of a partnership, and is governed by the same rules. To all persons who have had actual dealings with the agent, actual notice must be given, or such notice of the fact must be brought home to them as would be sufficient to put an ordinarily prudent man upon inquiry. Id. § 228. The reason for the rule in the case of a partnership is well stated by Butler, J., in *Lyon v. Johnson,* 28 Conn. 1, 4: A partnership "once existing, and publicly known to exist, the continuance of the connection will be presumed by the public till the contrary appears."

It is contended by plaintiff that the burden of proof is upon the partner seeking to escape liability to show knowledge or notice. But this rule does not relieve plaintiff of the necessity of any showing, on the part of the parties who were re-employed, as to the circumstances of their re-employment, the character of the new contract, and their good faith. The language of the books is: Persons "dealing in good faith;" "relying upon the agent's former authority;" "supposing that they were employed by defendant;" "who gave the credit to the agent for defendant;" "who believed that such agency continued;" "dealing with one partner in ignorance of the dissolution;" "supposing them still to be in partnership;" "giving credit to the partnership." As Lord Kenyon, in one of the cases, observes:

"It would be the hardest measure imaginable upon the creditor were the law otherwise,—if, while he *supposed he was giving credit* to a man having sufficient to satisfy the whole of his demands, he might be trusting a beggar."

Did these parties deal in good faith? Did they rely, assume, suppose, believe? To whom did they in fact extend credit? With whom did they contract? These are pertinent inquiries. Plaintiff must recover, if at all, upon the

theory that the employment was in fact continuous, or, if there was in fact a re-employment, that these parties were employed in the name of the defendant, or under such circumstances, and in such a manner, as to justify the assumption that they were employed for defendant, and that they in fact did so suppose, and extended the credit to the defendant. There must be sufficient evidence to bring these parties within one of these propositions. Until they are so brought there is nothing to start with; nothing to cast any burden upon the defendant. Defendant is not liable upon all contracts made by Jennings, but only upon such as have been made in reliance upon his apparent authority to act for it. It cannot be assumed or presumed that any new contracts were made in its name, or for it, or that credit was extended to it.

In the partnership cases the contracts were entered into on the faith of the partnership with one of the partners, in the name, and ostensibly for the benefit, of the partnership.

In *Hall v. Heck*, 92 Mich. 458, the notes were executed in the firm name.

In *Uhl v. Harvey*, 78 Ind. 26, the evidence tended to show that plaintiff acted upon the belief that defendant was still a member of the firm.

In *Uhl v. Bingaman*, Id. 365, 369, the court say:

"There can be no doubt that the general burden of the issue was, as the court instructed, on the plaintiff; but, in order to show his right of recovery against the appellant, it was only necessary to show that the appellant had been a member of the firm; that, knowing the appellant's connection, he had dealt with the bank; that the business had been carried on without change in the name of the firm, and was being so conducted at the time he made the deposit which the action was brought to recover. He was not bound to offer evidence of the negative fact that he had not received notice of the appellant's withdrawal."

In *Ketcham v. Clark,* 6 Johns. 144, the draft was accepted by one member of the firm in the firm name.

In the leading case of *Claflin v. Lenheim,* 66 N. Y. 301, defendant had been carrying on business in two different cities, and plaintiffs had been furnishing goods in both. Defendant's brother, as agent, managed the business in one of the places, and ordered the goods in the name of defendant, as he had been doing, and the credit was given to defendant.

In *Ulrich v. McCormick,* 66 Ind. 243, money had been. paid upon the note to a former agent of the payee. Held that, if the payor paid the note in question to the agent in good faith, without notice of the revocation of his agency, the payment was a satisfaction of the note. But the court say: "The question still remains, was the payment *bona fide?*"

In *Newcomet v. Brotzman,* 69 Penn. St. 185, defendant had turned his business over to his son, who had formerly assisted in the management. Plaintiff testified that he had been misled; that he had supposed that he was dealing with the father.

In *Rolling-Mill Co. v. Hyland,* 94 Ind. 449, the court say:

"It is admitted by the appellant that, $60.25 of the recovery was correct. But it is insisted that for the residue, being for work done after April 1, 1882, the appellant was not liable. The work prior to that time, about which there is no dispute, was performed by the appellee for the appellant, at its coke works. The works were operated by the appellant's agent, John J. Enders, who,. as such agent, employed and paid the workmen, the appellee among the others. Enders, having leased the works of the appellant, operated them upon his own responsibility, *but in the appellant's name,* without its consent, during the period for which the appellant disclaims liability to the appellee. The evidence tends to show that up to May 16, 1882, the time to which the finding was in appel-

lee's favor, he had no notice of the change in the management of the coke works, but supposed that he was working for the appellant under the employment of Enders as its agent. We cannot say that the facts and circumstances did not justify this impression, and, this being the case, we are of the opinion that the appellant was liable."

In the present case there was testimony tending to show a re-employment of these men, but there was absolutely no testimony respecting the nature of that re-employment, except that of Jennings, who said that after January 1, 1891, he made no contract in the name of the company. In view of this testimony there should have been some evidence to repel the natural inference that Jennings made the new contract in his own name, and to show that these parties supposed, at least, that they were dealing with the defendant, or that they relied upon the apparent authority of Jennings, and gave credit to defendant. If the language of the employment did not suggest the person employing, then it should appear that these parties supposed, at least, that they were being employed for the defendant.

Respecting the claims for board, the men to whom these amounts were payable were operatives in the mine. Irrespective of any custom or arrangement, these men, as assignees, would have the same right of recovery as their assignors. But the arrangement was that the amounts of these bills should be furnished by the keepers, and, in the time-slips that were given, these amounts were charged up against the operative, and credited to the keeper, who relied upon this method, rather than upon the individual responsibility of the boarders. The keepers were dealers with the defendant company, and are within the rule. No notice appears to have been given to them, and there was no error in the court's instruction to the jury.

It was competent to show the method of paying the

96 Mich.—7.

men prior to January 1, 1891, as well as that followed after that date.

The November and December, 1890, pay-rolls were competent for the purpose of showing that the operatives were in the defendant's employ during those months.

Judgment is therefore reversed, and a new trial ordered.

The other Justices concurred.