DRUCK v. ANTRIM LIME CO.

1. MASTER AND SERVANT—EMPLOYMENT—NEGLIGENCE—EVIDENCE.

A verdict for injuries sustained by plaintiff, who claimed he was hurt while in the employ of defendant corporation, is affirmed on his testimony tending to show that he was employed by defendant's president and another agent, and that defendant admitted the existence of the relation in a certain letter or exhibit, though defendant offered proofs to show that he was in the service of an independent contractor. The evidence presented a question of fact for the jury.

2. SAME—TRIAL—ARGUMENT.

Where plaintiff's counsel, in his argument to the jury, said that if they thought plaintiff was entitled to recover, he believed they would take the burden of his support off the taxpayers of the county and place it upon defendant, where it belonged, and no ruling on the objectionable language was secured from the court, whose attention was not directed to it, a new trial was correctly denied on motion of defendant alleging the improper conduct of counsel.

3. SAME—PERSONAL INJURIES—TERMINATION OF EMPLOYMENT.

Nor was it erroneous to instruct the jury that if, as plaintiff claimed, he was engaged by the president of defendant company, who was also general manager, and received his pay from the corporation, and, so long as he worked there, he had no notice or information that his employment had terminated or changed to that of and under an independent contractor, the relation of employee and employer continued to exist.

4. SAME—CHARGE—INSPECTION—MINES AND MINING.

In charging the jury relative to the duty of plaintiff's employer to inspect the face of the cliff which the men were engaged in blasting, the court correctly instructed them that it was the custom after a blast was fired to examine the face of the cliff and warn any of the workmen who might undertake to work at or near the place of the blast or within dangerous proximity thereto, before defendant had inspected it, and that under the undisputed evidence the plaintiff had received no warning on the occasion of the accident and the charge was not misleading or open to the objection that it left the jurors to infer that a custom had prevailed to inspect the entire face of the cliff, instead of the portion likely to be affected by the blast.

5. SAME—WEIGHT OF EVIDENCE—NEW TRIAL.

A verdict must be clearly against the great weight of the evidence to require the Supreme Court · to reverse the decision of the circuit judge in denying a motion for a new trial.

Error to Emmet; Shepherd, J. Submitted June 16, 1913. (Docket No. 102.) Decided October 1, 1913.

Case by William F. Druck against the Antrim Lime Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Pailthorp & Hackney (Henry S. Sweeny,* of counsel), for appellant.

*Maxwell W. Benjamin,* for appellee.

STONE, J. This case is before us for the second time. When first here it will be found reported in 167 Mich. 154 (132 N. W. 492), where there will be found a full statement of the case. A comparison of the two records will show that there is no material difference in the testimony adduced upon the two trials, and it is not deemed necessary to restate the case. Upon the first trial the circuit judge directed a verdict and judgment for the defendant, upon the ground of assumption of risk by the plaintiff. In reversing the case, we said:

"The most favorable statement for the defendant that can be made from this record is that whether the plaintiff was in the employ of the defendant, and whether the plaintiff assumed the risk, or was guilty of contributory negligence, were questions for the jury under proper instructions."

A second trial has resulted in a verdict and judgment for the plaintiff in a substantial sum.

The defendant has brought the case here upon writ of error, and by appropriate assignments of error it claims the following errors:

(1) The court's refusal to direct a verdict for the defendant at the close of the evidence.

(2) Improper and prejudicial remarks to the jury by counsel for plaintiff.

(3) Error made by the court in its charge to the jury. *(a)* The hiring of plaintiff by Nathan Jarman acting as president of the defendant company. *(b)* The custom to inspect the cliff after each blast.

(4) Error in denying the motion for a new trial.

*First.* Upon the first proposition it is the claim of the appellant that the relation of master and servant was not established between the plaintiff and the defendant company, but that plaintiff was in the employ of David Jarman, an independent contractor. There was a sharp conflict in the evidence upon this subject, and we are still of the opinion that it presented a question of fact for the jury. Upon this subject the court, at the request of the defendant, submitted to the jury the following special question:

"Was the plaintiff in the employ of the Antrim Lime Company, the defendant, upon the 19th day of December, 1908?"

The jury answered this question in the affirmative.

That there was evidence tending to support the claim of the plaintiff that he was in the employ of the defendant we need only refer to the record. About six months after plaintiff's injury, the defendant took measures to provide him with an artificial limb from Winkley Artificial Limb Co., of Minneapolis, Minn., and the following letter was written to that company by defendant:

"ANTRIM LIME COMPANY, GENERAL OFFICE MICHIGAN TRUST BUILDING, GRAND RAPIDS, MICHIGAN.
        "PETOSKEY, MICHIGAN, June 28, 1909.
"WINKLEY ARTIFICIAL LIMB CO.,
            "Minneapolis, Minn.
*"Dear Sirs:*
"I enclose herewith a receipt for W. F. Druck's signature, when he receives the artificial leg from you. I intended to have him sign it before he left here for Ludington, but did not have it ready. When you send your bill for the leg, please send the enclosed receipt with the signature and two witnesses.

"You can send the bill to me, or to our general office Grand Rapids (Mich. Trust Bldg.), and a check will be sent you in return.

"Our understanding is that we pay $100.
            "Very truly yours,
                "ANTRIM LIME COMPANY,
                "By N. JARMAN, Pres. and Mgr."

The receipt referred to in said letter, and which was inclosed in it, contained the following language:

"Whereas, I, W. E. Druck, did, on the nineteenth day of December, A. D. 1908, meet with an accident while employed by the Antrim Lime Co. and engaged at work in and about the limestone quarry at Petoskey, Michigan, which resulted in the loss to me of my right leg, and as said Antrim Lime Company, as a token of their appreciation and esteem for my services while in their employ, and upon consideration of the covenants and conditions hereinafter mentioned, has agreed to purchase for me an artificial leg to be by me worn upon the stump of the limb lost as aforesaid," etc.

(Here followed a discharge and release of any and all claims, demands, damages, and causes of action against the defendant by the plaintiff.)

This receipt was not signed by the plaintiff.

Not only did the plaintiff testify that he was directed in his work by Nathan Jarman, the president and manager of the defendant, but he also testified that he was paid by him. Upon the subject of the hiring, he also testified on cross-examination as follows:

"I stated in my direct examination that I was employed by Sherman Cassell. I say that he employed me to work for the Antrim Lime Company. * * * I have stated positively that Mr. Cassell was foreman of the Antrim Lime Company. I swear to that, because Mr. Nathan Jarman said it was the Antrim Lime Company that was running the kiln. In the very first place, the first man I spoke to of working anywhere was Mr. Nathan Jarman, working at the kiln; he said as quick as there is an opening, why, they would see about giving me work. I had this conversation with Mr. Nathan Jarman about two weeks before I commenced work. It was not brought up on the other trial.

"*Q.* Wasn't you asked, upon the other trial, who hired you?

"*A.* Yes, sir; Mr. Cassell hired me, and I testify to it now. I don't think that I testified at that time

of having two conversations with Mr. Cassell. Not to my recollection did I talk with Mr. Cassell about going to work there at some time previous to the time he told me I might come. The only conversation I had with Sherman Cassell was upon the day that he came there. At the time I had the conversation with Mr. Nathan Jarman, I went over to see him. I seen him milking his cow in his pasture field. I asked him if there would be any show working for him, and he said they were full now, but if there was an opening, why, he would give me a show.

"*Q.* Now just repeat the conversation, if you can, you had with Mr. Jarman, and what did you say to Mr. Jarman, and what did he say to you?

"*A.* I asked him—I was out of employment; the paper mill quit working—and I wanted to know if there was any show to work for the Antrim Lime Company or at the kiln, and he said at the present time they were full. 'But,' he says, 'if later on there is a show, we will give you a show.' Later on Mr. Cassell came and saw me. Mr. Cassell never told me he was the foreman of the Antrim Lime Company. Some of the men working there told me he was the foreman of the Antrim Lime Company."

The plaintiff had been laid off from his work in the summer of 1908. The wife of plaintiff testified to the following conversation with Nathan Jarman:

"I am acquainted with Nathan Jarman. He came to my place of residence in the month of August. My husband was working at the lime kiln before Mr. Jarman came to my place. I remember my husband being laid off some time before Mr. Jarman called. He was laid off a week or such a matter. He (Mr. Jarman) called to see Mr. Druck—asked for Mr. Druck. Mr. Druck was not there. I told Mr. Jarman that Mr. Druck would soon be there. Mr. Jarman said he wanted Mr. Druck to come to work at the Antrim Lime Company.

"*Q.* Said he wanted him to come to work for the Antrim Lime Company?

"*A.* Yes, sir; he said he wanted him to go to work the next morning. Mr. Druck did go to work the

177 MICH.—24.

next morning. He continued that work from that time down to the time of his injury."

It is true that this testimony, and all like testimony, was contradicted on behalf of the defendant. But that a question of fact was presented for the consideration of the jury seems too clear for controversy.

Under this head it is also claimed that the plaintiff assumed the risk of his employment, and that a verdict should have been directed for the defendant upon that theory. What we said in our former opinion is an answer to this proposition.

*Second.* Improper and prejudicial remarks to the jury by counsel for plaintiff. The language complained of was as follows:

"If you think that the plaintiff is entitled to recover, I am satisfied that you will take this burden off from the taxpayers of this county and put it upon the Antrim Lime Company, where it belongs, so that he will not have to depend upon charity, and so that he will not have to stand on the street corners selling shoe laces and pencils for meager earnings to buy bread for himself and family."

The plaintiff had testified without objection that during the three years since his injury he had been able to earn only about $50. This he had earned by selling lead pencils, shoe laces, and a few books, and that he was not able to do manual labor, and that he had been supported chiefly by charity, and by the aid of the city or county.

The above-quoted argument of counsel was excepted to; but there is nothing in the record to indicate that the matter was called to the attention of the court, or that the court was asked to rule upon it. The matter was urged as one of the grounds in support of the motion for a new trial. In his reasons for overruling the motion, the circuit judge, in referring to the subject, said:

"The court is unable to recall the remarks as alleged, and, while he has no doubt that they were made as alleged by counsel for defendant, he does not feel that they were so prejudicial as to be proper grounds for a new trial."

We think that the court did not err in reaching this conclusion, in view of the testimony and circumstances.

*Third.* Alleged errors in the charge. *(a)* The following language of the charge is complained of:

"Mr. Druck claims that he was hired by the president of the company; that he was told to go to work there by the president of the company, and never received any notice but what he was at work for the company; and that he received his pay from the president of the company.  *  *  *  On the other hand, Mr. Druck claims that he was hired by the president of the company, acting in his capacity as president or general manager of the company, and that as long as he was employed there he, Druck, had no notice or information that he was not in the employ of the company.  If you find that Mr. Druck was so employed, that is, hired by Nathan Jarman, acting as president of the company, to work for the company, he remained and was the employee of the company until he had notice of the arrangement, or independent contract, which the defendant company sets up as existing between itself and Mr. David Jarman."

In view of the testimony contained in the record, a part only of which we have quoted, and of the rule of law announced in *Tousignant* v. *Iron Co.*, 96 Mich. 87 (55 N. W. 681), we are of opinion that there was no error in that part of the charge here complained of.

*(b)* Error is also assigned upon the following part of the charge:

"It was the custom there, after a blast had been fired, to examine the face of the cliff, and to warn any of the workmen who might undertake to work at or near the place of the blast, or within dangerous proximity of the place of the blast—if they undertook

to do such work before the cliff had been inspected, it was the custom to warn them against going there. In other words, it was the custom to inspect the cliff and bar out loose pieces of rock, before workmen were allowed or permitted, without warning, to work under the cliff. No warning was given Mr. Druck, according to his testimony, and no witness claims that he was warned."

It is the contention of appellant that the only custom that the record shows was that after every blast the cliff was inspected to a point about 20 feet, at the farthest, on both sides of the point of blast, and that the effect of a blast was never known to reach beyond 20 feet on both sides of the point of blast, and that custom had established an inspection of the cliff to these points after each blast.

Upon the subject of inspection Sherman Cassell, the foreman, testified that after a blast, and before the men were permitted to return to work, he generally took a man or two with him, and went on top and saw that all the loose stuff was poked off, and so below; that he always did that; that some of the men might return to the ledge and work in other parts of the quarry where it was not dangerous; and that he was in the habit of warning men from the dangers of loose rock. It is true that this witness testified that in his judgment a blast set off there, where they had five or six holes drilled in, and filled with dynamite, would not affect or disturb the face of the ledge more than 15 feet from each side of the end of the battery holes, and all the way to the top; that he did not think there would be very much vibration across the entire ledge. Other witnesses varied the distance affected, and all testified that after a blast it was the custom to examine the face of the ledge to determine whether there was any loose rock or not.

The plaintiff testified that he was injured by a falling rock at a point about 50 feet from where a blast

had taken place the afternoon of December 18th, the day before. Upon this question the main contention of defendant was that there had been no blast the day before, and hence no warning. Whether there had been any blasting done the day before was, on defendant's motion, made the subject of a special question to the jury, and they answered that there was such a blast on December 18th.

We think that the trial court in the charge proper confined the place of inspection at or near the place of blasting, or within dangerous proximity to the place of blasting, and did not leave the jury to infer that it was the custom to inspect the entire cliff. We discover no error in that portion of the charge.

*Fourth.* Did the court err in denying the motion for a new trial? The grounds of the motion, not already covered, were that the verdict was against the weight of the evidence, and was not justified by the preponderance of the evidence. Upon these points the circuit judge, in giving his reasons for denying the motion, said:

"The weight of the evidence is for the determination of the jury; the court being of the opinion that there was sufficient evidence to go before the jury, upon which to render a verdict, and that the same was submitted to them under proper instructions, at least under instructions, as to which the defendant can find no objection, in that it was sufficiently favorable to it, and that the verdict of the jury must stand."

A careful examination of the entire record leads us to agree with this conclusion. Upon the main questions involved, the law of the case was settled when it was first before us. The learned trial court followed the opinion of this court in submitting the questions of fact to the jury. Upon the two main questions involved, the defendant by submitting special questions to the jury must be held bound by the answers given to such questions. *Stevens* v.

*Rose,* 69 Mich. 259-264 (37 N. W. 205) ; *Swanson* v. *Power Co.,* 113 Mich. 603 (71 N. W. 1098).

The rule is well settled that this court will only reverse a case upon the question of the weight of the evidence when the verdict is against the overwhelming weight of the evidence. The verdict must be clearly against the great weight of the evidence to require this court to overrule the decision of the circuit judge in refusing a new trial. *Gardiner* v. *Courtright,* 165 Mich. 54, 62 (130 N. W. 322) ; *Fike* v. *Railroad Co.,* 174 Mich. 167 (140 N. W. 592). We cannot say that the verdict in this case was against the overwhelming weight of the evidence, in the light of the record.

We find no reversible error in the record, and the judgment of the circuit court is affirmed.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, KUHN, OSTRANDER, and BIRD, JJ., concurred.