## SABIN *v.* SOUTHARD.

1. NEGLIGENCE—FIRES—EVIDENCE—ADMISSIBILITY.
   In an action for damages to plaintiffs' property caused by defendants' threshing machine engine, the admission of testimony tending to show that the engine had set other fires, *held,* not error.

2. TRIAL—INSTRUCTIONS—REFUSAL OF REQUESTS.
   Where such of defendants' requests to charge as should have been given were covered by the general charge, there was no error in refusing said requests.

3. APPEAL AND ERROR — JURY TRIER OF FACTS — NEW TRIAL — WEIGHT OF EVIDENCE.
   Since the questions of fact are for the jury, the Supreme Court will not reverse a case on the facts unless it appears that the trial judge was clearly wrong in refusing a new trial because the verdict was against the great weight of the evidence.

Error to Allegan; Cross (Orien S.), J.   Submitted

October 6, 1921.   (Docket No. 52.)    Decided March 31, 1922.

Case by George Sabin and another against John E. Southard and others for the negligent burning of plaintiffs' barn.   Judgment for plaintiffs.   Defendants, bring error.   Affirmed.

*Clare E. Hoffman* and *Myron D. Moore* (*W. J. Barnard,* of counsel), for appellants.

*Charles Thew,* for appellees.

MOORE, J.   This action is brought by plaintiffs against defendants to recover damages because of a fire which, on September 25, 1919, destroyed a barn and other buildings and personal property belonging to the plaintiffs.   Plaintiffs claim they entered into a bargain with John Southard, Sr., to thresh their grain, he to furnish plaintiffs the outfit with a crew; that in the forenoon of September 25, 1919, after they finished threshing, sparks from the engine set fire to the straw in the south mow which burned up the property mentioned.   It is the further claim that the man who was employed by them to run the engine was negligent in that the engine at the time was burning wood for fuel, and that it was not equipped with a hood spark arrester constructed in compliance with the statute, having an oval top of number 10 mesh 22 gauge wire and sides composed of number 6 mesh 16 gauge wire.   It is claimed that while the wind was blowing from the engine toward the barn, the engineer backed up 3 times to within 30 feet of the large barn door and hitched to the separator, which was in the barn; that smoke in large volumes blew directly into the barn door and upon the south mow of straw, and that he knew the engine threw sparks when burning wood sufficient to set fire within

that distance, and that it had done so a short time before; that he then took the separator and went away without warning plaintiff or making any arrangements to watch for fires, and that the barn was soon afterwards discovered to be on fire. The plaintiffs further claim defendant Harry Eldred, the engineer, exercised gross negligence in what he did and that he did not have any spark arrester in place on the smokestack. That plaintiffs relied upon the defendants using due care and having an engine and handling it in a way not dangerous for the setting of fires.

The defendants claim that the defendant John Southard, Sr., had nothing to do with the making of the bargain for the threshing; that he had sold the outfit to the other two defendants, and that these two defendants were operating the threshing machine outfit and that they threshed for the plaintiffs. They claim that they informed plaintiffs that they should furnish coal for fuel; that the coal furnished was not enough and that the plaintiffs were so informed and told them to use wood. They claim that the wood furnished was poor wood and liable to throw sparks. They claim this engine was well equipped to burn good fuel and was carefully operated by the defendants. They claim they had a suitable screen in the smokestack and that in taking the engine and separator from the farm of the plaintiffs the engine was operated in a prudent and careful manner. The defendants claim they were not guilty of any negligence whatever in threshing for the plaintiffs. They claim that the plaintiffs were guilty of contributory negligence in not furnishing good fuel and in not taking the proper precautions to prevent fires. The defendants claim they are not liable to the plaintiffs in any sum whatever. The jury returned a verdict in favor of the plaintiffs in the sum of $2,041.80. A motion

for a new trial was made and overruled. The case is here by writ of error.

Counsel discuss the claimed errors under the following heads:

(1) Errors in the admission and rejection of testimony.

(2) Errors in the refusal of defendants' requests to charge.

(3) Errors committed in the charge of the court given *sua sponte*.

(4) Errors in refusing to grant a new trial.

1. Counsel contend that the introduction of testimony tending to show that the engine had set other fires was incompetent, irrelevant and immaterial and was prejudicial to the rights of the defendants. The cases cited by counsel have been examined in connection with the record, and do not show the court erred in the reception of such testimony as he received upon that phase of the case.

Heads 2 and 3 may be considered together. Counsel call attention to the five written requests which they offered and which were not given except as covered by the general charge. The charge to the jury covers 13 pages of the printed record and covers such of the defendants' requests to charge as should have been given.

4. Did the court err in refusing a new trial? We are in grave doubt as to whether the judge ought not to have granted a new trial to John Southard, Sr., for the reason that the verdict as to him is against the great weight of the evidence. We quote some of his testimony:

"*Q.* What have you had to do with the threshing business the last two or three years?

"*A.* Nothing.

"*Q.* At all?

"*A.* No, sir.

"*Q.* Did you make any bargain with Mr. Sabin to do any threshing?

"*A.* Mr. Sabin drove in there, of course, and he got to talking and he asked us if we were going to run and I told him I supposed the boys were and he had a job and I told him probably they would do it.

"*Q.* What was the principal talk that day?

"*A.* It was about horses.

"*Q.* Did you have anything to do with the threshing business this year or last year, 1919?

"*A.* I didn't have anything to do with it the last three or four years. I turned it right over to the boys; I am too old to thresh and I always told everybody so and I ain't a going to do it any more.

"*Q.* Did you go over to this job with them or go over to this man at all last year?

"*A.* No, sir."

Cross-examination by Mr. Thew:

"*Q.* John, who owns that machine?

"*A.* Well, you might call it Harry Eldred and John Southard, Junior.

"*Q.* Don't you have any interest in it at all?

"*A.* I let them have it and turned it over to them and they pay me along when they are a mind to.

"*Q.* How much is there back on it they owe you?

"*A.* What they owe me? I don't know how much they paid me particularly.

"*Q.* What did you sell it to them for when you turned it over to them?

"*A.* I ought to get a thousand dollars out of it.

"*Q.* What did you sell it to them for when you turned it over to them?

"*A.* I told them to go ahead and make what they could.

"*Q.* You sold the machine to them at what price?

"*A.* Well, I told them that I ought to get a thousand dollars out of it.

"*Q.* And how much have they paid you now up to date?

"*A.* Oh, probably five or six hundred.

"*Q.* Well, do you know they have paid you that much?

"*A.* Why, I should judge they have.

"*Q.* Have you kept any track?

"*A.* I couldn't tell you exactly.

"*Q.* Have you kept any track of it?

"*A.* Well, not much.

"*Q.* Have you put it down in a book when they would pay you from time to time on that engine?

"*A.* No, I never booked it.

"*Q.* Never booked it at all?

"*A.* No.

"*Q.* Just kept it in your head?

"*A.* Yes, sir.

"*Q.* Who owned the threshing machine?

"*A.* That is the threshing machine we are talking about.

"*Q.* I thought we were talking about the engine.

"*A.* Oh, the engine. I thought it was the whole rig, that is what I calculated; the engine and the separator goes together, also the tank, pump and hose.

"*Q.* All for a thousand dollars?

"*A.* Yes, sir.

"*Q.* Now when was that you sold that to them?

"*A.* Four years ago.

"*Q.* Can you tell me about what time of the year?

"*A.* Well, I think it was about along in June.

"*Q.* You think that was in June four years ago?

"*A.* Yes, sir.

"*Q.* Last June?

"*A.* Three years ago is when I got the new one for them. We had an old one we had run a good while and the boys thought they ought to have a little better rig and so John and I, we went over to Hartford and struck a fellow and bought a new separator.

"*Q.* And you turned it over?

"*A.* Sure, and let them go right on.

"*Q.* You turned it over to the boys?

"*A.* Yes, sir.

"*Q.* That was two years ago?

"*A.* That was three years ago.

"*Q.* Who did you buy that of, the Rumely Company direct?

"*A.* Yes, the Rumely Company.

"*Q.* You bought it of them direct?

"*A.* Direct, no, I—

"*Q.* Or through some agency?

"*A.* Well, sir, an agent came to our house and gave us quite a talk and we went over and saw another one and that didn't hit us and before we got through we made a bargain for this new one.

"*Q.* And you made that with the agent of the Rumely Company?

"*A.* I suppose so.

"*Q.* What was his name?

"*A.* I don't know; I suppose John could tell.

"*Q.* Did you pay all cash for it?

"*A.* John is in the business—

"*Q.* Did you pay all cash for it?

"*A.* Yes, sir.

"*Q.* Paid all cash down?

"*A.* Yes, sir.

"*Q.* Who paid the cash?

"*A.* Well we had it fixed up between us.

"*Q.* Who furnished the money; you?

"*A.* I went to the bank and signed the checks over.

"*Q.* That is, you had the money in the bank and gave our check for it?

"*A.* Some of us did.

"*Q.* Did you have your money in the bank and give your check for it?

"*A.* No, I give a check on the bank.

"*Q.* Your check on the bank?

"*A.* Well, you could call it mine or the bank check; I suppose it would be on the bank.

"*Q.* Then it was your money that paid for the machine?

"*A.* Well, it was ours together.

"*Q.* How do you—

"*A.* The boys always helped make the money.

"*Q.* So you kept your money altogether?

"*A.* We kept it going in just that way.

"*Q.* So you had this money in the bank in your name?

"*A.* Yes, sir.

"*Q.* But all of you owned it together?

"*A.* Yes, sir.

"*Q.* So you drew your check on that money to pay for this machine?

"*A.* Yes, sir."

The two young men testified as to the ownership substantially the same as the father.

Mr. Sabin testified as to the arrangement about doing the threshing as follows:

"*Q.* What arrangement did you make for having your grain threshed and who did you talk with and who was present and where?

"*A.* John Southard, Sr., at his place.  I went over and talked with him, if he could come over in the neighborhood and thresh and he said he had a job or two to do down here, down toward Chicora, and he said he would be over in our neighborhood in about two weeks.  I said, 'All right, I would like to thresh as quick as I can because I have got a lot of grain stacked and wouldn't like to have it get soaked.'  He said, 'I think we can get in there in the two weeks and thresh you out.'  I said, 'All right' and went home.  I told him where my grain was, that I had a job of rye on Mr. Montague's place, which is on this side of the river.  At that time there was nothing said about coal or anything pertaining to the terms of the threshing.  We talked about terms.

"*Q.* Tell all that occurred there at that time?

"*A.* I think he said he charged 9 cents for oats and 10 cents for rye.  That is about all the conversation we had there at that time.

"*Q.* Was there anything said as to the men he would furnish?

"*A.* He was to furnish the crew."

Mr. Southard gives a different version of this arrangement and says he told Mr. Sabin that he had no doubt the young men would do the threshing and that he did not agree that he would do it.  The license to do the threshing issued by the secretary of state was issued to John Southard, Jr.  The older Southard did not accompany the machine and took no part in the threshing which was done at the plaintiffs'.  However, the questions of fact are not for us to determine unless the trial judge was clearly wrong in refusing a new trial.  He saw and heard the witnesses.  He listened to the direct-examination and the cross-examination.  It is evident he was of the opinion that what was said on the direct-examination could not well be harmonized with what was said on the cross-examination and by the actual conduct of the business.

We think we ought not, under the well-settled rules of this court, to reverse the case because a new trial was not granted. *Gardiner* v. *Courtright,* 165 Mich. 54; *Fike* v. *Railroad Co.,* 174 Mich. 167; *Druck* v. *Antrim Lime Co.,* 177 Mich. 364· *Walsh* v. *Railway Co.,* 185 Mich. 177.

The judgment is affirmed, with costs to the appellees.

FELLOWS, C. J., and WIEST, CLARK, BIRD, SHARPE, and STEERE, JJ., concurred.

The late Justice STONE took no part in this decision.