FIKE *v.* PERE MARQUETTE RAILROAD CO.

1. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—RAILROADS.

In an action for injuries received at a crossing of defendant railroad, plaintiff, whose husband was driving the conveyance in which she was riding and who drove on the track before a passing passenger train, was not chargeable with contributory negligence *per se* for not attempting to jump from the wagon, and while plaintiff was chargeable with the negligence of the driver, she could recover, if the defendant saw or should have seen the peril of the plaintiff in time to have averted the accident, in the exercise of ordinary care.

2. SAME—GROSS NEGLIGENCE.

Even if the negligence imputed to her amounted to gross negligence, plaintiff was not precluded from recovering.

3. SAME—SUBSEQUENT NEGLIGENCE.

Evidence that plaintiff's husband drove on defendant's track in the view of an approaching train, that as the team reached the rails they became frightened by an explosive discharge of steam from the locomotive, that they turned so as to cramp the wheel under the wagon and, notwithstanding the driver's efforts to force them across the track, the horses were beyond his control and plaintiff was struck and injured, that the engineer was seen to be looking ahead at the time the train approached the crossing and, at a distance of 150 or 200 feet, waved or motioned in some manner to the driver, that from the time the horses stopped on the track, 18 or 20 seconds elapsed until the rig was struck, that the train was moving at the rate of about 8 or 10 miles an hour and no slackening of speed was observed by plaintiff's witnesses before the collision, with further evidence tending to show negligence, *held,* to present a question for the jury as to defendant's "subsequent" negligence.

4. SAME—GROSS NEGLIGENCE.

Whenever a defendant sees a person in danger or by exercising only ordinary care in the discharge of his duty should discover such danger in time to avert an injury and either fails after discovering it to take steps to avert it, or fails to discover the danger, the fact that plaintiff's danger arose in the

first instance because of his own negligence does not prevent him from recovering.[1]

5. SAME—WEIGHT OF EVIDENCE.

In view of the rule that a verdict should not be reversed for the reason that it is contrary to the weight of the evidence, unless it is contrary to the overwhelming weight of the evidence, it cannot be held as a matter of law that the court should have granted the motion for a new trial.

6. DAMAGES—PERSONAL INJURIES.

A verdict of $25,000 in favor of a married woman 37 years of age, the wife of a common laborer, for the loss of her left hand and part of the arm, loss of the left foot and a severe scalp wound over the eye, nervous shock and attendant pain and injuries, plaintiff's husband having been killed in the accident, is excessive and should be reduced to $17,000. BROOKE and MCALVAY, JJ., dissenting.

Error to Bay; Collins, J. Submitted November 22, 1912. (Docket No. 49.) Decided March 20, 1913. Rehearing denied June 2, 1913.

Case by Mary Fike against the Pere Marquette Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reduced and affirmed.

*Bills, Streeter, Parker & Shields* (*Weadock & Duffy* and *Weadock & Weadock,* of counsel), for appellant.

*Henry R. Rathbone* and *Joseph P. Haffey,* for appellee.

STONE, J. This case arises out of injuries sustained by the plaintiff in a collision between a wagon and team, driven by her husband, in which she was riding, and a passenger train of the defendant company, known as train No. 420, at the intersection of McKinley avenue, or Eighth street, and Jefferson street, in the city of Bay City, on the 10th day of July, 1911. The place and sur-

[1] As to doctrine of "last clear chance," see note in 55 L. R. A. 418, and 7 L. R. A. (N. S.) 132.

roundings involved, and referred to in the testimony, are shown on the blueprint appended to the record.

The claim of the plaintiff is substantially as follows: That on the day named she was riding in a wagon drawn by two horses, with her husband, Charles Fike, and her child, then six years of age; that Charles Fike was driving east on McKinley avenue, or Eighth street, in the city of Bay City; that McKinley avenue was intersected by Jefferson street at right angles; that the tracks of the defendant company run north and south along the center of Jefferson street; that on reaching the crosswalk of said street she looked and saw a train approaching from the north; that the train was then in the neighborhood of Seventh street, one block to the north of the intersection, which was about 300 feet distant; that the horses' heads were then within a few feet of the track; that the horses suddenly became frightened by the blowing off of steam from the engine of the train, and jumped forward onto the track; that they became unmanageable and the wagon cramped on the track; that she and those with her were thereby placed in a position of peril, and remained there for a period of at least ten seconds; that during all this time they were in plain view of the engineer of the train in question; that the engineer had his head out of the cab, and was looking directly at the wagon and its occupants; that the engineer knew that the plaintiff was in a position of danger, and would be injured if the train were not stopped or its speed slackened; that after discovering her peril the engineer could have stopped his train by the exercise of ordinary care, or slackened its speed and avoided the accident; that he did not do so; that a collision resulted; and that the plaintiff was injured to the extent that necessitated the amputation of her left hand between the wrist and elbow, and the amputation of her left foot; also, that she received injury to her head, and other injuries.

On the other hand, it is the claim of the defendant that, at the time and place in question, the defendant was not

at any time or under any circumstances guilty of any negligence; that it was not guilty of any negligence in the first instance, and it was not guilty of any subsequent negligence in respect to the transaction; that the plaintiff by her contributory negligence put herself in a place of danger; that at all times, and under all circumstances, the defendant was free from negligence, and it is its claim that the accident is what would be known as an unavoidable accident, or, at least, one where the defendant was not in any way to blame for its occurrence.

The accident occurred soon after 3:40 o'clock in the afternoon of a bright, clear day. The train was a passenger train which had just left the depot some 1,700 feet north of the place of the injury; the said depot being located between Third and Fifth streets. That the blocks between Fifth and Ninth streets on Jefferson street are 300 feet long. That the streets between and including Fifth and Ninth, and exclusive of Center street, which is also an intervening street north, were 60 feet wide; Center street being 99 feet wide. Jefferson street runs practically north and south, and McKinley avenue east and west. Both streets are straight at the point of intersection. The railroad track is in the center of Jefferson street, and it is 30 feet from the center of the track to the lot lines. The sidewalk, both on McKinley avenue and Jefferson street, is 6 feet wide, and the inside edge of the sidewalk is about 1½ feet from the lot line. On Jefferson street there are 7½ feet between the outer edge of the walk and the curb of the pavement. On McKinley avenue there are 9 feet of grass plot between the curb and the walk. The McKinley avenue pavement, which is asphalt, was 24 feet wide, and that of Jefferson street, which was of brick, was 30 feet wide. From the west line of the railroad track to the curb on Jefferson street was 12½ feet. From the west rail of the tracks to the west side of Jefferson street within the line of McKinley avenue it is 27½ feet. The track is of standard gauge, 4 feet 8½ inches. The brick pavement on Jefferson street was put

in before McKinley avenue was paved. It had been the custom for many years to pave the wings down from the edge of the pavement the full width of the street. The pavement on Jefferson street at said intersections was put in the full width of the street from lot line to lot line all the way down. McKinley avenue, when paved subsequently, was paved with asphalt up to the wings of the Jefferson street pavement. The undisputed evidence shows that the rails of the railroad track were laid flush with the pavement in Jefferson street, in accordance with the requirements of the city. The evidence is also undisputed that any one approaching Jefferson street on Mc-Kinley avenue can see the rails of the track for some distance before reaching the crossing; many of the witnesses testifying that the track could be seen as far back as the alley, half the width of the block.

The undisputed evidence shows the make-up of the train to have been as follows: The engine, No. 59, and tender were 55 feet 4 inches in length; baggage car, No. 474, was 69 feet long, and was next the engine; followed by combination mail and baggage car, No. 424, 53 feet long; the smoker, being car No. 705, was 60 feet long; and day coach, No. 914, was 77 feet 10 inches long. These measurements are from bumper to bumper. The total length of the train would thus be 315 feet 2 inches. This accident occurred in the residence portion of the city, and the evidence shows that there was considerable traffic upon McKinley avenue by reason of its having been a paved street.

The case was submitted to the jury solely upon the theory that it was a question of fact for them to determine as to whether or not the defendant company was guilty of any gross or subsequent negligence which might permit the plaintiff to recover, notwithstanding the contributory negligence of her husband and herself. The court refused to direct a verdict for the defendant at the close of the plaintiff's proofs, and also at the close of the case, to which ruling defendant's counsel duly excepted. Among

the grounds upon which the motions to direct a verdict were based were that the defendant was not guilty of any negligence, either wilful, gross, or subsequent; that the plaintiff was guilty of contributory negligence; and that even if the defendant might be said to have been guilty of any negligence, whether gross, or subsequent or not, the plaintiff was guilty of concurrent negligence. The jury rendered a verdict in favor of the plaintiff for $25,000, and a judgment accordingly followed.

A motion for a new trial was made upon 16 enumerated grounds, among which are set forth the claims that the verdict was against the weight of the evidence and that it was excessive. The motion for a new trial was denied, and the court assigned reasons therefor in writing, which reasons were duly excepted to by defendant.

Including the plaintiff, there were 11 eyewitnesses to the injury sworn upon the trial, 9 for the plaintiff and 2 for the defendant, including the fireman, who, while present, claims he did not see the actual collision. We cannot undertake to quote and analyze the entire testimony in this opinion. The record is a large one, and there are 17 counts in the declaration. The case was submitted to the jury, however, upon the last 3 counts of the declaration alleging subsequent negligence on the part of the defendant.

The evidence is undisputed that at the time of the accident the train was running from six to ten miles an hour. It is also undisputed that the automatic bell was ringing upon the engine, and that the noise of the approaching train was clearly discernible to the eyewitnesses of the injury. The circuit judge charged the jury that they must find that the bell was ringing at the time of the collision, and for some time prior thereto. He also charged them that, as matter of law, there was no evidence in the case that the defendant's train was running at an undue, improper, illegal, or excessive rate of speed, and that there was no evidence in the case that the emission of steam

from the engine was improper or negligent. He also charged the jury that Charles Fike, the plaintiff's husband, who was driving the team, was, as matter of law, guilty of contributory negligence in failing to exercise the care which the law requires in approaching the railroad crossing, and that the negligence of Charles Fike was imputable to plaintiff, as matter of law.

Robert Lang, the conductor in charge of the train at the time of the collision, and a witness called on behalf of the plaintiff, after testifying that the train had been inspected and was in good condition, including the engine, and the number of cars there was in the train, testified that, as they approached the intersection of McKinley avenue and Jefferson street, he was at the fifth or sixth seat on the left-hand side of the smoking car from the head end, and did not personally witness the collision; that just before the accident he judged the train was running at the rate of six miles per hour. On cross-examination this witness testified that the air was applied in emergency on the day of the accident, when about a hundred feet south of Seventh street, and said:

"When I say that, I mean that where I sat in the train would be about 100 feet south of Seventh street. I was in the head end of the smoking car, and the smoking car was between the baggage car and the day car and was the third car from the engine."

That the bell was ringing automatically from the time they left the depot to the time of the collision. He testified that he did not know exactly how long it was from the time the air was applied until the train came to a stop, but presumed it to be about ten seconds or so after the application of the air.

Charles F. Rutterbush, a witness for the plaintiff, testified that he was a witness to the accident; that he was on the east side of Jefferson street on McKinley near the intersection at the time of the collision, had turned his horse around facing the west and was delivering ice; that he

noticed the Hart team and also Mr. Fike's team approaching from the west; that Mr. Fike's team was north of Hart's and a little behind as they approached Jefferson street; that Mr. Fike had a two-horse team and a lumber wagon; that there were a man, woman, and child in the wagon, and the man was driving, the child was in the center, and the woman was on the north side of the wagon; that, as Mr. Fike's team reached the crosswalk where McKinley and Jefferson avenues intersect, the horses were apparently prancing, which commenced when they were just about on the crosswalk and about 10 or 15 feet from the track; that they went forward onto the track; that at this time he noticed a train was coming from the north; that at the time the horses got upon the track he would judge that the engine was about the south crosswalk of Seventh street, one block away; that the track was straight; that about that time there was a sudden outburst of steam from the engine, that from the time the horses were first prancing upon the track to the time of the collision the witness could not state whether or not the engine slackened its speed at all; that after striking the horses it ran the width of about three lots, which were shown to be 50-foot lots; that the horses at the time were on the track, but the wagon was not.   On cross-examination this witness testified that when he saw the Fike team crossing it was trotting or prancing, and that the Hart team was on what the witness calls a trot, and that the Fike team was coming right along with it; that the Hart team was a little south of the Fike team, and that the Hart team turned south down Jefferson on the west side of the track; that both teams had gotten up to the crosswalk when he first saw them; that the Fike team was acting as though the horses were scared; that he saw the Fike team endeavoring to make the turn; that it looked to the witness as though Mr. Fike was making an effort to stop his team and let the other man get ahead of him in order to clear himself and that his (Fike's) team was prancing and

unmanageable; that at that time the engine was just at Seventh street.

"*Q.* As a matter of fact, wasn't the engine right at the north crosswalk of Eighth street?

"*A.* I couldn't say it was.

"*Q.* You wouldn't say it wasn't, would you?

"*A.* Yes, sir; I would.

"*Q.* Is it not a matter of fact, when you saw the Fike team coming up, it was trotting, and the engine got there practically at the same time that the Fike team got to the crossing?

"*A.* No, sir; I couldn't say so."

He then testified he made a motion to the teams because he thought they were going to head directly into him.

It appeared that this witness had been a witness at an inquest held on July 17th, and had testified upon this identical subject. The following occurred:

"*Q.* You were sworn at the coroner's inquest, and I ask you now if you were asked this question, and did you give this answer:

" '*Q.* Just tell the jury what you saw or know about this. *A.* Why, I didn't see very much. I had occasion to stop on the corner house, the southeast corner of Jefferson, to deliver 25 pounds of ice. I came out and turned my horse and wagon to the west and waited for the train. Just as I got turned around, I noticed Mr. Hart's team and this other team coming ahead for Jefferson at a fair gait. I motioned my hand like that (illustrating) for them to stop. Whether they seen me or not I cannot tell. Then Hart's team tried to make the turn, and Mr. Fike's team went right along by the side of the front wheel of Hart's wagon. He, also, tried to make the turn. He couldn't, but Hart's did; Mr. Hart's team being to the south. I knew there was going to be an accident, because the train was right at the crossing at the time they came up, and then Mr. Fike's team was kind of cornering across the rails in this way (illustrating). I seen the cowcatcher strike the horse, throwing him to the pavement, until it took him out of view.'

"*Q.* Were you asked that question, and did you give that answer?

"*A.* I gave that answer except that engine being so close; I don't remember saying that part at all.

"*Q.* Is your recollection of the facts of the accident better now than it was at the date of the coroner's inquest?

"*A.* Yes, sir; I dare say it is.

"*Q.* You think it is better now?

"*A.* I think so, because that day I was pretty excited and for a week afterwards yet.

"*Q.* I ask you if at the coroner's inquest, which was held July 17th, one week after the accident, you were asked this question, and did you give this answer: '*Q.* Mr. Rutterbush, when you first saw the teams coming east on McKinley, how far were they from the crossing? *A.* Just about directly on the crosswalk. *A.* That is when I first saw them, yes, sir. *Q.* It was apparent to you that they were going to come together, and you signaled to the drivers of the teams? *A.* Yes, sir.'

"*A.* I don't remember that question.

"*Q.* Will you say you did not give that testimony?

"*A.* I will not; I don't remember the question.

"*Q.* Were you asked this question, and did you give this answer: '*Q.* As they came down McKinley back towards the east, did they stop at all before going on the crossing? *A.* It looked to me as though they both tried their best to stop. *Q.* As it looked to you after they saw the train was there. *A.* Yes, sir.'

"*Q.* Were you asked these questions and did you give these answers?

"*A.* I think I did.   *   *   *

"*Q.* Were you asked this question and did you give this answer: '*Q.* When the horses were about the center of the rails on McKinley and the engine was about at the north crosswalk? *A.* Yes; when the horses were about on the south crosswalk. *Q.* No, when they were in the middle of McKinley, the front of the engine was right near the crosswalk on McKinley? *A.* Yes, sir.'

"Did you answer those questions in that way?

"*A.* I was asked that question, and that answer is wrong.

"*Q.* You say you didn't give it?

"*A.* I did not.

"*Q.* Were you asked this question: '*Q.* You could hear the train? *A.* I could, I made a special effort to hear it. *Q.* You heard it at the station? *A.* No, sir. *Q.* Did you look up and down there? *A.* No, sir. *Q.* When did you first hear it? *A.* When I first came out of the house.'

"Were you asked those questions and did you give those answers?

"*A.* I was asked those questions; yes, sir. But when I came out of the house I did not hear the train, yet that answer is written there.

"*Q.* Immediately following that, were you asked these questions, and did you give these answers: '*Q.* Where was it then, do you know? *A.* I couldn't tell. *Q.* Would you say it was halfway when you saw it? *A.* No, sir; I didn't see the train until I saw the others, and I saw the train and this team right there together.' Were you asked that question and did you give that answer.

"*A.* I can't recollect answering the question there.

"*Q.* Will you say you did not give that testimony?

"*A.* I will not. * * *

"*Q.* Were you asked these questions and did you give these answers? '*Q.* As they came down McKinley towards the east, did they stop at all before going on the crossing? *A.* It looked to me as though both pulled, tried their best to stop. *Q.* As it looked to you after they saw the train was there? *A.* Yes, sir. *Q.* Prior to that was there any slowing down by the team? *A.* I didn't see them pull up till then.'

"*A.* I gave that answer; yes, sir. But I didn't see the team prior, until they were on the crosswalk. * * *

"*Q.* Referring to the train at that time, were you asked these questions and did you give these answers: '*Q.* What was done to stop it? *A.* It seems from the engineer, it looked as if the engineer made every effort to get things under control. *Q.* You did see him working, as you thought, to stop the train? *A.* It looked to me as though he was making all efforts. *Q.* When he passed you, or before? *A.* After it struck the horses. *Q.* You didn't notice him before that time as to whether he was doing anything? *A.* No, sir. *Q.* When you did look at him he was busy? *A.* Yes, sir; I happened to take an interest in that because I am an engineer myself.' Were you asked those questions and did you give those answers?

"*A.* Yes, sir.

"*Q.* Were you asked these and did you answer as I read: '*Q.* What did you see the engineer do to try to stop? *A.* He was at the big lever, though the motions

he went through trying to jerk it back. *Q.* Reverse? *A.* I think so.'

"*A.* Yes, sir. * * * Mr. Fike had the lines in his hands all the time I saw him. It looked as if the Hart team tried to slow up and let the other team go by. Mr. Fike's team was prancing and dancing. You can't tell much about a horse whether it is slowing up or not, going that way.

"*Q.* You could not say whether he stopped or not from the time you saw him on the west sidewalk on Jefferson street until the last time you saw him, which was, as I understand it, on the south sidewalk of McKinley avenue. You don't know whether he made a stop or not?

"*A.* His horses were practically standing right still when he was on the south walk of McKinley avenue.

"*Q.* That was when the train struck him?

"*A.* That was when the train struck him.

"*Q.* Up to that time he had moved from the west sidewalk of Jefferson street down to the south walk of McKinley street?

"*A.* Yes, sir.

"*Q.* And you didn't see the horses stop until they stopped over the south crosswalk of McKinley street, when the engine was on top of them?

"*A.* They stopped with their front feet on the track."

Marcell Machelski, a witness for the plaintiff, testified: That he was a witness to the injury to the plaintiff, and at that time he was on the west side of Jefferson and the north side of McKinley, and was going south. That he saw the train on Fifth street when he made the turn into Jefferson at Sixth, and that as he walked along he heard it puffing pretty strong coming along behind him. That he saw the two teams. First he saw a team coming down McKinley and turn on Jefferson south. Then he saw the Fike team. That they appeared to be crossing Jefferson going east, headed that way. Before they got to the tracks, he saw the driver raising up and sawing away at the horses trying to stop them, but the horses were frightened and they kept right on going. When they got on the tracks, the man was trying to turn the horses to go the same direction the other wagon went. That the

horses were prancing all the time and frightened, and the wagon was cramped in such shape he could not turn or go ahead very well.

"*Q*. How long did that last before the collision, to the best of your judgment?

"*A*. I couldn't really recollect how long it lasted; maybe—it didn't last very long—maybe 10 or 12 seconds. I don't think it lasted very much longer than that.

"*Q*. When you first saw the team commencing to jump, as you have described, on the tracks, when they first commenced, do you know, as near as you can tell, where the engine was?

"*A*. Why the engine was behind me then yet.

"*Q*. About how far from the intersection of McKinley avenue were you at the time?

"*A*. Why, it was about 10 feet from the gutter line of the north side of McKinley avenue.

"*Q*. Did you see the engine strike him?

"*A*. I saw the engine strike him, yes.

"*Q*. Just describe what you saw there; tell how it struck and what it struck.

"*A*. The engine struck the front wheel as the wagon was cramped. It struck the front wheel, cut the horses off from the wagon, and throwed the lady off the wagon right on the side, and the little girl fell off, and the old man disappeared. I don't know where he went or what became of him.

"*Q*. What did the engine do?

"*A*. The engine kept right on going.

"*Q*. How far did the engine run after striking the wagon before it came to a stop, to the best of your judgment and recollection?

"*A*. Why, I don't know, it looks to me, I couldn't say for sure, but pretty near 200 feet, I should think."

On cross-examination this witness testified: That he heard the train leaving the station when he turned into Jefferson from Sixth. That Sixth street is two blocks north of McKinley. That when he was walking south on the west side of Jefferson, and that when he got between Seventh and Eighth streets, he heard the train coming back of him again. That he did not pay much attention to the train anyway. That when he got 50 feet from the

corner of Eighth and Jefferson he saw that wagon turn the street. That he says was the first team. That before he saw the second team at all he was within 10 to 20 feet of the northwest corner of McKinley and Jefferson. That when he was at this point the second team drove up from McKinley going east. That was the first time he saw the team.

"*Q.* Where was the train at that time?

"*A.* I don't know whether it was behind me; I didn't look for the train.

"*Q.* When you walked that ten feet and got to the north crosswalk of McKinley avenue, where was the train?

"*A.* The train was behind me; I didn't look for the train.

"*Q.* When you got to the corner, the northwest corner of McKinley and Jefferson, is it not a fact that the train was just crossing the north sidewalk line of McKinley avenue?

"*A.* I didn't get to the corner.

"*Q.* The train passed you?

"*A.* No, when I got within about 10 feet from the corner I stopped.

"*Q.* Where did the train go then?

"*A.* The train was behind me then, pretty near opposite to me when Is topped, because that team was on the crossing then, and I says: 'My God! If that fellow don't get off the track he is going to get killed.'

"*Q.* The train was alongside of you then?

"*A.* The train was about alongside of me then.

"*Q.* You were about 10 feet from the northwest corner of McKinley and Jefferson?

"*A.* Yes, sir; somewhere along there.

"*Q.* When you first saw the Fike team driving from behind the McDonald house going east on McKinley?

"*A.* Going east on McKinley.

"*Q.* From the time you first saw them, did they make any stop until they got on the track?

"*A.* Well, he kept on jerking, sawing on the lines; but the team kept sprinting, jumping, and going.

"*Q.* He couldn't stop them?

"*A.* He made attempts, but was frightened or something, but he didn't stop them until he got that wagon on that crossing cramped, and then he stopped them.

"*Q.* At that time the train was practically alongside of you?

"*A.* Somewhere behind; I didn't look for the train; it was puffing right behind me somewhere.

"*Q.* As soon as you saw Mr. Fike come out, you saw at once there was going to be an accident at that crossing?

"*A.* When he was crossing, I said: ' My God ! That man will be killed if he don't get off.'

"*Q.* You know that the train was right alongside of you or just a little back of you at that time?

"*A.* Somewhere along there, yes.

"*Q.* What do you mean by somewhere?

"*A.* I didn't see the engine then; it was behind me somewhere right close; by the noise of the engine, I thought it was pretty close to me.

"*Q.* You knew it was alongside of you, within 10 or 15 feet back of you?

"*A.* It might have been five feet for all I know; I didn't measure.

"*Q.* How far back of you was the train when you turned into Jefferson street and first looked north, intending to go north, and then turned south at the time you say you saw the train coming, where was the train then when you saw it?

"*A.* I kind of think it was right by the Bay City Club House somewhere.

"*Q.* That would be the block between Fifth street and Center street?

"*A.* Yes, sir.

"*Q.* And Sixth street would be the block next on Jefferson street where you came east on Sixth street looking north and saw the train in this block here between Fifth and Center?

"*A.* Yes, sir.

"*Q.* Then you turned and walked south?

"*A.* Yes.

"*Q.* And by the time you walked from Sixth to Eighth the train had come from some point in this block here between Fifth and Center to this point up near McKinley avenue where you have described it, was right alongside of you?

"*A.* Yes, sir.

"*Q.* How fast was the Fike team going?

"*A.* I couldn't say that.

"*Q.* Did it go from the point where you first saw it pretty fast?

"*A.* Well, they were frightened or jumping or something; I couldn't say how fast, not really fast.

"*Q.* The whole thing happened pretty quickly?

"*A.* It took about 10 or 12 seconds from the time he got on the track, that the train hit him I testified yesterday.

"*Q.* From the time you first saw them and they got to the track and the whole thing happened, it wouldn't be 10 seconds?

"*A.* He kept sawing away, but I don't know how much time it took. I seen him raising up and falling down in the seat from pulling that way.

"*Q.* He was evidently making an attempt to stop the horses?

"*A.* Yes, he did; he tried and raised up and kept sawing on the lines.

"*Q.* He could not do that, apparently?

"*A.* No.

"*Q.* Then he tried to turn them south?

"*A.* Then he tried to turn them south, to turn the same way as the other teams ahead of him.

"*Q.* And he couldn't make the turn short enough?

"*A.* He couldn't make the turn because he got on the track and cramped that wagon so short the boards on one side raised up, one side of the box, the 2x4's in the bottom was altogether raised up.

"*Q.* A sort of sand wagon, was it?

"*A.* A sort of sand wagon, yes.

"*Q.* It does not cramp very short?

"*A.* Well, no.  *  *  *

"*Q.* From the point standing on the sidewalk where you first saw the Fike team come up, are you able to say how far away the engineer was at the time so that he could see him coming out?

"*A.* No, I couldn't say that.

"*Q.* Were you sworn at the coroner's inquest?

"*A.* Yes, sir; a very little, not much.  *  *  *

"*Q.* Were you asked this question by one of the jurors at the inquest: '*A Juror:* How far had the engineer ought to be able to see that team? *A.* Why, he ought to be able to see that team 30 or 40 feet away.' Were you asked that question, and did you give that answer?

"*A.* Yes, sir; on the track he ought to.

"*Q.* And that was true?

"*A.* Yes, sir.  *  *  *

"*Q.* Let me see if you remember being asked this question and giving this answer: '*Q.* Where did the train pass you? *A.* About pretty near at the crossing at the north side of the sidewalk.' Were you asked that question and did you give that answer?

"*A.* Yes, sir.

"*Q.* That was true?

"*A.* Yes, the train passed me there after I stood there; yes.

"*Q.* And the next question in the same connection: '*Q.* On the McKinley street crossing? *A.* Yes, sir; I kept on, walking pretty fast.' Were you asked that question, and did you give that answer?

"*A.* I was asked that question, but I didn't give that answer.

"*Q.* That was true?

"*A.* Well, I don't say that.

"*Q.* I don't mean by that you crossed McKinley street?

"*A.* No, I didn't walk fast because I couldn't; it was too hot. I don't think I made any stop until I saw the team, and then I stopped. I stopped just about 10 feet from the crossing, I should judge, about 10 or 15 feet; I don't know; I wouldn't be sure. After the team got down the track, he did succeed in partially turning south. He had the horses off, pretty near clear of the track; both front wheels were on the track at the time the train got on the crossing.

"*Q.* I mean at the time of the collision?

"*A.* Yes, about the time of the collision both front wheels were on the track.

"*Q.* Are you sure about that?

"*A.* Well, both were cut off, so they must have been on the track.

"*Q.* As to whether only the left wheel was broken?

"*A.* They were cramped in that way. Both wheels were on the track. The north wheel of that wagon was pretty well to the east rail, and the other was pretty well to the west rail, the way that wagon was cramped."

The witness further testified that the horses, at the instant the engine hit the wagon, were on the east side of the track, and that he saw the engine strike the wagon; that the accident happened within about 30 feet from him,

and he could not see what was done with the horses; that the engine was between the witness and the horses. On recross-examination the witness was asked:

"*Q*. Were you asked this question and did you give this answer at the coroner's inquest: '*Q*. What part of the locomotive struck the wheels, could you tell? *A*. I guess the cowcatcher to the beam.'

"*A*. No, that question was not put to me at all. The beam could not hit it if the cowcatcher hit it.

"*Q*. Were you asked this question, and did you give this answer: '*Q*. The engine struck one of the horses first? *A*. No, struck the front wheel.'

"*A*. Yes, sir."

Mrs. Bessie May McDonald, a witness on behalf of the plaintiff, testified: That at the time of the collision she was in the house of her sister-in-law, Mrs. Eliza McDonald, in what was known as the McDonald house, on the northwest corner of Jefferson street and McKinley avenue. That she was sitting in the parlor in the front part of the house, which fronts on McKinley avenue. That the room has two windows facing south, and one east on the porch. The first that she heard was a woman cry out on the street, and she heard the clicking of the hoofs of the horses on the brick pavement about the same time. She testified that the train stood almost in front of the window; that she got up and looked to the southeast; the window being open; she saw the wagon and team on the brick pavement at first. The horses, she thinks, were unmanageable.

"It appeared that way, and the man was trying to turn them south off the track, and he didn't succeed very quickly, and the train—he had the wagon cramped—and the train hit the wagon."

That just at that time the man threw the child over on the lawn, and the engine struck right away after that. She testified that in her judgment the horses and wagon were upon the track a few seconds before the engine struck; she thinks perhaps 10 or 12 seconds. She testified

that the engine, when she went out to the door, had
passed down south on Jefferson in front of Mr. Harding's
house, being the third house south from the intersection of
McKinley avenue. On cross-examination she testified
that she first saw the Fike team through the front window
driving along on the asphalt pavement on McKinley ave-
nue about 50 feet from the railroad track. When she
first saw the Fike team it was pretty near the Smith
house, which is the next house west of the one she was in.
After this she did not notice the team again until she
heard the commotion and noise. The horses were trot-
ting along just at an ordinary gait; she did not see the
Hart team at all. When she first saw the Fike team in
the neighborhood of the Smith house, she testified that
she knew the train was coming and could hear it, and be-
lieved she heard the bell ring. In fact, she knew the train
was coming, but did not know how close the train was;
did not pay any attention to it at first; and she thinks she
saw the train a second perhaps before it hit the wagon.
She was not able to state whether the engine was not
practically alongside of her house as the Fike team was
approaching the crossing; at least, it was very near, and
the collision happened quite suddenly; and by that she
means it may have been more than 5 seconds, but she
could not be more positive. She saw the driver apparent-
ly trying to stop the horses or turn. She thought he was
trying to turn them south, and that at that time the train
was very near, very close to McKinley avenue; she does
not think it was to exceed 30 or 40 feet away. She testi-
fied that the wagon was cramped so that the engine struck
the left wheel, and that was the only wheel that was
broken; the other wheel was still on the wagon. The
wagon stood there two or three days after the collision,
and the left front wheel was broken off. She further tes-
tified that the track on Jefferson street could be seen by
one walking east along McKinley avenue from the alley.
On redirect examination the witness testified that she

thinks that looking out of the window toward the east she would not be able to see the engine until opposite the porch, she thinks it would be about 50 feet or more that she would be able to see the engine from the time it came into her view until the time it struck the wagon; that she did not pay any particular attention to the engine, as she was more interested in the people; and that she was not able to accurately state how far the engine was away at the time she saw the team on the track.

Eliza McDonald, the sister-in-law of the last witness, testified on behalf of the plaintiff that she was in the same room with the last witness at the time of the collision; that she was first attracted to the street by the sound of the horses' feet on the pavement and the lady screaming; that she went to the south window, the one nearest the west side of the house, and looked out and saw two teams on the street, one directly in front of the other; that the team driven by Mr. Fike was prancing on the pavement, and she noticed the man and woman in the wagon. She testified further that the horses appeared to be frightened and were prancing and jumping first to one side and then to the other, just a little, they were not going ahead to any extent, nor were they backing, they were almost in the same place; that Mr. Fike was driving them; he was apparently trying to hold them still; that she saw the engine strike; that just before it struck, the man threw the child out on the ground; that it fell on the grass plot between the walk leading up to Mr. Williams' residence and the street sidewalk, being upon the south side of Mc-Kinley avenue; that to the best of her judgment and recollection, from the time she saw the horses prancing, as she has described above, up to the time the engine struck, she believes some 10 or 12 seconds elapsed; that before the engine came to a stop it went as far south as Chief Harding's residence, the third house from the corner, and the lots are 50 feet in width. On cross-examination this witness testified that she did not notice either

team pass by her front window on the asphalt pavement because her back was rather toward the west as she was seated on a couch there; that the first thing she saw of the Fike team was when she was attracted by the team striking the brick pavement and she then looked out the window. The horses were prancing at that time, and Mr. Fike was making an effort to pull them back or turn them in some way. That at that particular time the train had not yet got to the crossing. That when she first saw the teams the Hart team was directly in front of the Fike team; both facing south on Jefferson. The Hart team had succeeded in making the turn and was turned straight on Jefferson street. That the Fike team had succeeded in making the turn also. That the Hart team was directly ahead of the Fike team, and she thought the Fike team was about the middle of the pavement. That there was not room enough between the west rail of the railroad track and the west curb for the two teams to go abreast. She testified that when she first looked out it appeared as though Mr. Fike was trying to hold his horses; that he was upon the brick pavement before she saw him at all; that the wagon was between the end of the crosswalk and the railroad track, and the horses had not yet reached the track; that it was at that point that she saw him try to pull the horses back. He did not succeed in pulling them back to any extent. Her attention was called to her testimony before the coroner's inquest, and she was examined at length as to her testimony there. This witness further testified that from the time her attention was directed to the horses prancing she heard the train coming and heard the bell ringing; that coming east on McKinley avenue one can see the rails of the track from the middle of the alley between Jefferson and Adams street on the west. This witness was also asked whether at the inquest she had not testified as follows:

" Q. When you first saw these horses, what, in your judgment, was the distance between the west rail of the track and the horses?

" *A.* Oh, well, perhaps 6 feet."

She said she so testified. And she further testified that the horses were about the middle of the pavement, which would be six feet away from the track, or in that neighborhood. This witness testified also to the extent of travel on this street.

Robert Bassett, a witness called on behalf of the plaintiff, testified: That he witnessed the collision. That he was on the west side of Jefferson street at the time of the collision going north about 200 feet south of McKinley avenue. That the first he noticed was a team apparently stalled on the track that appeared to be excitable and unmanageable. It was a lumber wagon, sand box. A man was driving the team, and a woman and child also were in the wagon. About that time he noticed the train coming south. The train at that time was just south of Seventh street. That he continued to watch the engine and team on the track. The man was apparently trying to control the team. At that time he noticed the engineer. His head and shoulders were out the cab window, and he was looking straight ahead, apparently at the teams and people. As the engine approached, it appeared to be running about 8 miles an hour. There was some steam escaping from the engine. As the train approached, witness noticed the engineer wave his hand; he made a motion crossways and indicated somebody was on the track. At the time the engineer did that, the engine was about midway between Seventh and Eighth streets. From the time he first saw the engine up to the time it struck the wagon, he did not notice any change in the speed of the engine. After the engine struck the wagon it ran about 200 feet. He noticed the man throw the child. He noticed the horse and wagon on the west side of the track on McKinley street; the horse facing the west. From the time he first noticed the horses on the track up to the time the engine struck, he judges it was about one-quarter of a minute; it was a warm, bright day, very dry. On cross-

examination he reiterated as to the place where he first saw the engine. He saw the Hart team turn south into Jefferson street.

" The Hart team made the turn all right; that team was somewhat in advance of the Fike team."

He testified that the Hart team was just about making the turn when he first saw the Fike team. The Hart team was on the south side of McKinley avenue, and the Fike team was in the center, or to the north side of the street as they came east. Witness was walking during all the time, and the train was coming on during the time he walked. When he first saw the Fike team, it was about 6 feet from the track, and the horses were plunging a little from side to side. What first attracted his attention was the team, and when he saw the team prancing he happened to look and saw the locomotive coming. He further testified that there was no change in the speed of the engine from the time he first saw it, until it stopped; that he was not paying particular attention to that feature of the operation of the train; that, when he spoke of observing the engineer looking out of the cab, witness was not paying any particular attention to the train any more than he had in mind that a train was coming; he could see the engineer outside of the cab before the engine reached the crossing of McKinley avenue, and saw him make the motion about the middle of the block between Seventh and McKinley avenue; that it was a good 150 feet away from McKinley avenue when he saw the engineer make the motion. He saw the team prancing about 6 feet from the track.

Charles E. Williams, another witness called on behalf of the plaintiff, testified that he witnessed the collision. That he was a few feet south of Sixth street and had started to go across Jefferson street. He was on the west side of Jefferson street. That he saw the team prancing, and it seemed to be unmanageable at the corner of Jefferson and McKinley avenue. That the team appeared to

be on the railroad track. That the man seemed to be trying to get the horses across or turn them, or do something in view of getting them off the track. About that time he noticed the engine and train. The engine was then just a few feet beyond Mr. Forsythe's house. It was going along at a pretty fair gait, about the way it ordinarily runs along that street. From the time he first noticed the horses prancing on the railroad tracks, up to the time the train or engine struck the wagon, he judges it was from 12 to 16 seconds. He observed the engineer on the engine as it ran along there. The engineer was on the right side leaning out and looking ahead, seemed to be looking straight ahead.

" After he got along a little ways, he made some kind of a motion like that (indicating). He moved his hand out in the direction to the right, and with a sweeping motion."

In the witness' judgment the train was 150 to 200 feet from the wagon when that occurred. He noticed that the engine let off some steam. He ran to the place where the collision occurred and found Mrs. Fike sitting there in distress. He noticed the train after it came to a stop. The head of the engine was then about middle way of the block between McKinley avenue and Ninth street; that Mr. Forsythe's house, as here alluded to, was at the corner of Seventh and Jefferson. The first thing he saw was this team on the track; he did not notice the Hart team. The horses were on the west side of the track when the engine cleared them of the wreck. Witness could not say whether the horses were knocked down or not. He did not remember whether Mr. Fike kept hold of the lines when he threw the child or not; he did not see anybody else touch the lines.

William Thompson, a witness called on behalf of plaintiff, testified: That he was the driver of the Hart team. That he came down McKinley avenue driving east. That he was on the south side of McKinley and saw the Fike

team just before the accident. It was alongside of the witness' team; witness partly in the lead. Witness was driving about four miles an hour. When the witness came up close to the crosswalk of Jefferson street, he started to swing around the corner south, and made the turn south on Jefferson street. That when he got to the corner of Jefferson street he looked up the street and saw the train coming up to Seventh street. About that time he saw Mr. Fike driving east. The last he saw of Mr. Fike before the collision he was on the track. The horses were prancing and jumping around there, and he was trying to hold them. That the horses appeared to be prancing and dancing because of steam from the engine. He could hear the steam blowing off. From the time that he first saw Fike's horses turn on the crossing on the track, up to the time that the engine struck, he judges it was from 18 to 20 seconds. The engine came to a stop down at the house the other side of Tom Harding's, four houses from the corner. On cross-examination this witness stated that he saw the train coming at Seventh street; that that was what he turned for; that he was about 50 feet west of the railroad track when he started to walk his horses, and the horses continued to walk until they turned around the corner; that just as he was going to start to make the swing he looked north up Jefferson street and observed the train at Seventh street; that when the collision occurred he was about 50 or 60 feet south on Jefferson street. He repeated that the engine was at Seventh street when he saw Fike's team on the track; that Fike had not been on the crossing before witness heard the train. Witness testified that the train as it came down the street was making 8 or 10 miles an hour, in his judgment.

The plaintiff was sworn and testified generally in the case as to her injury and the circumstances leading up to it. She testified that just before the accident they were driving east on McKinley avenue; that they had a wide tire wagon with a sand box and two horses hitched to it;

that the wagon was empty, excepting the child, Mr. Fike, and the witness; that Mr. Fike was seated on the right-hand side of the wagon and witness on the left, and the little girl was between them; that Mr. Fike drove along there at a moderate trot, probably covering four or five miles an hour; that he had the reins in his hands and his feet against the front sandboard or dashboard; that he was looking straight ahead of his team; that she noticed a wagon a little to the south of them and a little in advance. It was a heavy team with a truck. When that team reached the corner of Jefferson and McKinley it turned south. When her team reached the crosswalk on the intersection of the two streets Mr. Fike pulled up on the reins and slacked the horses down, so that they were practically walking. As they reached the crosswalk she looked south and noticed Mr. Fike looking at the north, and she turned her head to the north and saw the train approaching. That the train was then about at the next street crossing north. That at that time their horses' heads were right near the west rail of the railroad track. That she did not know they were approaching a railroad track as they drove up. About the time she looked and saw the train, the engine gave off a puff of steam, and at that moment their horses became frightened and jumped forward and landed directly on the track. That they commenced to step around and became unmanageable, and Mr. Fike tried to either turn them or make them do something, and the wheel caught. The wheel got cramped under the edge of the wagon. That from that time up to the time of the collision the team was unmanageable and did not move away. Mr. Fike was trying to get the team off the track. He was jerking on the lines and trying to control the horses. They were prancing around and appeared to be frightened.

"*Q.* As the train came towards you, will you state whether or not—well, will you state how it ran, that is, as to the speed, the way it appeared to you, if there was

any change in the speed from the time you saw it up to the time of the collision?

"*A.* I didn't notice any change in the speed of the train.

"*Q.* Did you notice anybody in connection with the engine on that train?

"*A.* I noticed the engineer looking out of the cab.

"*Q.* Was that on the engineer's side?

"*A.* Presumably so, it is on the west side of the engine coming this way.

"*Q.* Did you notice his head, and did you notice in which direction he was looking?

"*A.* He was looking in our direction.

"*Q.* State whether or not that continued all the time you observed him?

"*A.* He was looking in our direction.

"*Q.* And what, if anything else, did you notice in regard to him or his action before the collision?

"*A.* I noticed him raise his hand and wave it at us.

"*Q.* How many times did he wave?

"*A.* Well, I couldn't state about the amount of times, but it was more than once; twice or three times, for us to get out of the way.

"*Q.* How far away was it at that time that he did this, to the best of your judgment and recollection?

"*A.* Well, I couldn't say, he had got—well, I wouldn't say; the center of the block, either north or south of it; I wouldn't say just exactly. I couldn't give the exact distance. * * *

"*Q.* Will you state what the position, as near as you can remember, just before the collision, were the front wheels of your wagon with relation to the track?

"*A.* Well, I think the left front wheel was a trifle over the rail.

"*Q.* And which wheel was it that was cramped, if you know, as you have described?

"*A.* Why, the wheel on the right-hand side of the wagon was cramped under the wagon box. * * *

"*Q.* And the collision, when the engine struck, what part of the wagon did it strike?

"*A.* It struck the front wheel first, the left front wheel.

"*Q.* From the time that your horses first jumped onto the track, as you have described, up to the time that the collision happened, between those two points of time, to

the best of your judgment and recollection, about how long a time passed ?

"*A.* Well, I couldn't give the time, but it was between a quarter and a half minute.

"*Q.* When the engine struck, what happened to you ?

"*A.* I fell from the wagon. The train passed over my left leg and left arm. I didn't see what happened to my husband or child. The first thing that I can distinctly remember after the collision took place is that I was in the hospital, and they told me they had amputated my arm and limb. It was the second day in the hospital that I discovered the amputation. My left arm was amputated just below the elbow and my left leg above the ankle. I was taken to Mercy Hospital in Bay City and remained there four weeks. I was in bed for several weeks after they took me home from the hospital. My head was cut open on the left side, and my body bruised from my head to my feet. My left shoulder was bruised. During that time I suffered very great pain. I was very weak and nervous when I was first able to leave my bed. I was 37 on August 19, 1911."

Witness then stated : That she had been married about eight or nine years before the accident, during which time she had kept house for her husband and did all the work; worked in the garden whenever she had time from her household duties. That before the injury she was not a nervous person, and the general condition of her health was good. That since the injury she could not sleep well. That her rest was very poor, and she had severe headaches and severe pain in the head, and that she suffered from these headaches practically all the time; and that since the accident she had experienced a great deal of trouble with her back, across the small of the back, and up and down the back, and that it hurt her to move. On cross-examination she stated that her husband pulled the team to a walk when they were near the street crossing, almost on it; that she did not notice the railroad track until she looked up and saw the train coming; that she and her husband were sitting on a board across the box, not on a spring seat; that, when she first saw the train in the neighborhood of Seventh street, the horses were not

yet right on the track, but were perhaps five or six feet from it; but that they immediately jumped forward onto the track, and when they jumped onto the track the train was near the next street crossing; that she noticed the explosion of steam from the engine, and the horses then made the lunge forward; that the horses kept jumping around until they slewed or cramped the wagon. She was interrogated on cross-examination minutely as to whether, as the train was approaching, it occurred to her there was going to be a collision. She answered that she did not know or could not tell what she thought at the time, or that she had any thought about it. She reiterated that, at the time the horses took the plunge upon the railroad track, the engine was probably 150 or 200 feet away, north of them. She was interrogated as to why she did not jump out of the wagon. She answered that she did not think of it for one thing, and another thing was that the wagon was cramped in such a shape it did not place her in a very good position to get over that way; that the horses when the wagon was cramped were turned to the south. She does not know whether they turned far enough so that they were entirely off the track. She knows that the engine struck the front wheel, but she could not state just where the horses were then standing, and she does not know whether either of the horses was hit by the engine. It is very evident from her testimony that she was very much frightened and excited at the time, as would be natural under the circumstances.

De Witt Forsythe, another witness produced by the plaintiff, testified: That he saw the collision, and that at the time he was on the west corner of Seventh and Jefferson, and that he first noticed the Fike team on the center of the railroad track. That at that time he saw the engine of the train about the fourth lot north of McKinley avenue. That he noticed the engineer.

"Q. Just tell, if you know, what he was doing?

"A. He was leaning out of the window and let out steam.

"*Q.* Did you notice anything in regard to any steam coming from the engine at that time?

"*A.* Yes, sir.

"*Q.* In which direction, if you know, was the engineer looking?

"*A.* He was looking to the south.

"*Q.* Well, as to whether he was looking straight ahead or not, what do you say?

"*A.* He was looking straight ahead.

"*Q.* From the time you first saw the engine up to the time it struck, will you tell how it ran, as to whether it slowed up or not? State whether it slowed up or not.

"*A.* I didn't see any slacking of speed, didn't notice.

"*Q.* Did you see it strike?

"*A.* Yes sir.

"*Q.* And what did you notice then, if anything?

"*A.* I noticed the child going out of the wagon.

"*Q.* And what did you do when it struck?

"*A.* I ran up to the scene of the accident."

Witness then testified that he saw the plaintiff lying on the pavement between the railroad track and the side, the curb; and the engine was then near Chief Harding's house. On cross-examination the witness testified that he did not see the team until he saw them right in the center of the track, and that the horses were headed south over the south crosswalk; that he thinks the east half of the wagon was on the track; it was kind of diagonal across the track.

The defendant called as a witness James E. Jennings, who testified that he was the engineer in charge of the engine at the time of the collision. He described what occurred substantially as follows:

"*Q.* Where was the engine with reference to Eighth street when you first saw the Fike team that day?

"*A.* The head end of the engine was at the north crosswalk in McKinley avenue.

"*Q.* Where was the Fike team?

"*A.* In the middle of McKinley avenue, driving east.

"*Q.* Where had you first seen the Fike team when you were a little north, as you say, of the north crossing of McKinley avenue; where did you first see the Fike team when you were a little north of the crossing?

"*A.* Why, the front end of my engine was right at the north crosswalk of McKinley avenue.

"*Q.* When your engine was there, where was the Fike team?

"*A.* They were very near on the track, or very close to it.

"*Q.* How far west of the west rail of the track was the Fike team when you first saw it coming in on Jefferson street?.

"*A.* Well, they wasn't very far; I couldn't say as to the feet. I never made no measurement of it.

"*Q.* Where with reference to the west crosswalk on Jefferson street?

"*A.* They were between the east side of the crosswalk and the tracks somewhere.

"*Q.* Well, what did you do when you saw them?

"*A.* Why, I shut the engine off and applied the emergency brakes.

"*Q.* How quickly did you do that?

"*A.* Just as quick as I could do it.

"*Q.* Did you feel your emergency go on?

"*A.* Yes, sir.

"*Q.* Do you know which part of the rig as it stood, whether it was the horses or wagon, that you struck?

"*A.* I struck the horses, I think, first.

"*Q.* What part of the wagon do you know that you struck?

"*A.* I don't know of striking the wagon at all.

"*Q.* From the time you first saw that team until the collision, how quick a time elapsed?

"*A.* Probably some second or two.

"*Q.* Was there anything with respect to the application of the emergency brake that you could have done that you did not do to avoid the collision? Just describe exactly what you did do to get the emergency brake on.

"*A.* Why, I had to shut the engine off.

"*Q.* Was that done?

"*A.* Yes, sir.

"*Q.* What was the next thing you did

"*A.* Get hold of the brake valve and put it into the emergency position.

"*Q.* Was that done?

"*A.* Yes, sir. * * *

"*Q.* With those actions was the brake put in emergency, or was anything else to be done?

"*A.* No, sir; I didn't have time to do anything else.

"*Q.* Was there anything else you could do with the air that you did not do to stop that train?

"*A.* No, sir.

"*Q.* Where was your train when it finally stopped after the collision, when it became stopped after the collision, do you remember?

"*A.* It was two cars and the engine by the south curb of the McKinley street sidewalk; that is, the south side of the sidewalk, the south sidewalk.

"*Q.* Between Seventh and Eighth, Mr. Jennings, were you leaning out of the cab window at the time in question?

"*A.* No, sir.

"*Q.* Something has been said about your waving your hands about the middle of the block between Seventh and Eighth; did you wave your hands?

"*A.* No, sir.

"*Q.* Did you see another team there as well as the Fike team?

"*A.* Yes, sir.

"*Q.* Where was that team with reference to the Fike team when you got up towards the north crossing of McKinley avenue, as you have described?

"*A.* The Hart team made the crossing there at Jefferson and McKinley, and the Fike team drove straight out."

The witness further testified, on his direct examination, that he discovered, when he reached the Columbia avenue stop farther south, that he did not have any driver brake on the engine. He also testified that at the time of leaving the depot the safety valve was set to blow off at a pressure of 160 pounds, and that at no time before the collision had the steam worked up to the exhausting point of the safety valve; therefore it could not have blown off. Upon cross-examination this witness testified very fully in regard to the defect in the emergency appliance, and that by reason of the defect the brakes did not work upon the driving wheel of the engine, but did operate upon the remainder of the train. There was considerable testimony upon both sides as to the effect this defect would have upon the stopping of the train, and there was considerable conflict in such testimony.

Edward L. Swayze, a witness sworn on behalf of the defendant, testified that he was the fireman upon engine No. 59 at the time of the collision. He testified that there was no opportunity for the engine emitting steam that day, because they did not have to exceed 150 pounds when they left the depot. He further testified in regard to the collision as follows:

"As the engine approached the corner of Seventh and Jefferson street that day, I was on the seat box and was on it after crossing Seventh street until the accident. I was there for the purpose of keeping a watch on my side of the engine. Seated in my proper position as a lookout, I should judge I would be about 30 feet back of the pilot of the engine. I would have to get to about 10 feet from the intersection of Jefferson and McKinley before my view to the west would be cut off by the front of the engine, I should think. I kept the lookout during all the time until the engine got to a point 10 feet from the north crossing. There was no conveyance of any kind on the track from the time I left Seventh and Jefferson street until I got to McKinley avenue crossing that I saw. During the time we were passing from Seventh to McKinley street I was watching for conveyances that might be coming onto the track. I didn't see the Fike team at all before the accident. During the time I was keeping a lookout from Seventh street to a point 10 feet north of the crossing of Jefferson and Eighth street, if the team of horses and wagon were on the railroad crossing I would be able to see it. I didn't see any team ahead at all, and I was looking that way; by that I mean horses or wagon either. The first thing I knew of a team being in collision with the engine was by the emergency brakes being applied. The cab window of the engine was just about on the north crosswalk of McKinley crossing Jefferson, when the emergency brakes were applied; I mean the window of the cab where I was sitting, the seat box. I didn't see the engineer apply the emergency, but I felt the sudden stoppage of the engine. I judged by the feeling of the brakes. It would take a little while to have them applied so that I would feel it. I don't know at what point previous to the time the brakes took effect they were applied. The application that is described that I felt near the crosswalk was the emergency application. There is a difference in feel-

ing between the application at service, and the application of emergency of air; it is such a condition that trainmen recognize it and can tell.    When the train stopped I got off at the right-hand, or engineer's, side of the engine.    I didn't notice particularly where the engine was when it stopped.    I saw Mr. Fike when I got on the ground and assisted in taking him off the engine.    I took him over and laid him on the grass between the sidewalk and the pavement.    I saw where the wheel of the wagon was. There wasn't anything left of the wheel but the rim and the tire.    It was hanging on the step of the tank between the tender and the engine.    I noticed the wagon and that the other wheels were on it; there was just one wheel off. I noticed the horses.    When I first noticed them after the train stopped, they were about 50 feet south of the south crosswalk of McKinley and Jefferson.    They were standing along the curbstone and seemed to be standing quietly. I didn't notice anything in connection with the air brake at that stop.    The engineer operates that."

The defendant has brought the case here for review, and there are 213 assignments of error.    Most of these assignments of error are discussed by appellant's counsel under the following heads, or reasons for reversal:

(1) The plaintiff and her husband were both guilty of contributory negligence, and his negligence is imputable to her.

(2) The plaintiff was guilty of gross negligence.

(3) The defendant was guilty of no negligence, ordinary, subsequent, or gross.

(4) The negligence of the defendant, if any, was not the proximate cause of the accident.

(5) If the defendant was guilty of any negligence, the plaintiff was guilty of concurrent negligence.

(6) The verdict was against the weight of the evidence.

(7) The verdict was excessive.        '

(8) The court erred in the charge as given.

(9) The court erred in the admission and exclusion of testimony.

(10) The improper argument of the plaintiff's counsel to the jury.

There were 86 requests to charge tendered by the defendant.    We shall not undertake to set them all forth in

this opinion.   The court charged the jury at great length, in the course of which it used the following language:

"Now, there is one thing that I will call your attention to at this time.   The testimony shows, and it has been stated over and over again, that the plaintiff's husband, Mr. Fike, was driving the conveyance.   He was the driver.   When Mrs. Fike stepped into that wagon and her husband drove it, she became in this situation under our law, and that is, that whatever negligence Mr. Fike was guilty of, she was chargeable with; that is, his negligence was her negligence.   That is known in law as imputed negligence; that is, as applied to this case, the negligence of Mr. Fike is the negligence of the plaintiff in this case.   Now, testimony has been given as to the manner in which the plaintiff, or the plaintiff and her husband, because it means the same thing, approached the crossing. Now, I will state now that so far as the point of approaching that crossing was concerned, and up to the time in which the plaintiff found herself in a dangerous situation, that up to that time the plaintiff was guilty of negligence in approaching the track.   The street is an open street. The track is in plain sight, and up to the time that the plaintiff got into the dangerous position which has been described before you, she was guilty of negligence; that is, her husband was guilty of negligence in getting into that dangerous position, and that made her guilty of negligence, so that you will not be called upon to inquire as to whether the plaintiff was or was not negligent in getting into this dangerous position.   I instruct you as a matter of law that she was guilty of negligence in getting into the position of peril.   That leaves the case, then, just as I stated it to you.   The case for you to consider is whether or not the defendant is guilty of what is known in law as subsequent negligence.   That is, negligence after the discovery of the peril of the other party, and upon that question, gentlemen of the jury, upon the question of subsequent negligence and the liability of the defendant, upon that point I charge you as follows, and this request is mainly in the language of the counsel for the plaintiff, and is to be received by you the same as if written in the first instance by myself, and I ask your attention to the charge because it is brief and will not be repeated.

"I charge you that, as a matter of law, that even

though you may believe from the evidence that the plaintiff and her husband, Charles Fike, were guilty of negligence, yet if you further believe from the evidence, and under the charge of the court, that the defendant was also guilty of negligence, and that the negligence of the plaintiff and of said Charles Fike was precedent, and that the negligence of the defendant, if any, was subsequent thereto, then the plaintiff would not necessarily be prevented from recovering damages in this suit. I further charge you that if the plaintiff and her husband were in a position of peril on or near the track of the defendant, and that the engineer of the defendant's train in question saw and realized that the plaintiff was in such position of danger, and knew or had good reason to believe that plaintiff could not extricate herself from such position of peril, or reach a place of safety, and that great injury to the plaintiff would be inflicted unless the train was stopped or its speed slackened, and that said engineer after so observing and realizing the peril of plaintiff could, by the exercise of due care or reasonable diligence, have stopped his train or slackened its speed with his engine and air brakes in the condition they were then in, and by so doing could have avoided injuring the plaintiff, and that said engineer did not stop his train or slacken its speed, and in failing to do so was guilty of negligence which caused the injuries to the plaintiff complained of, even though you may believe from the evidence that the plaintiff or Charles Fike was guilty of negligence, yet if you further believe that such negligence of both the plaintiff and Charles Fike ceased before the negligence of the defendant began, and did not again occur before or at the time of the collision, then the jury should find for the plaintiff. This statement of the law, as I have stated to you, was prepared by counsel for the plaintiff, and has been given as modified in some respects by myself.

"The defendant has requested me to give certain charges to you and certain requests which I give, some in the exact language of the requests and some as modified by myself. By reading these requests to you, gentlemen of the jury, I make them a part of my charge, and they are to be considered by you as the charge of the court, the same as if originally prepared by myself. It is a common practice, and in fact it is the proper practice, for counsel to furnish full requests, because they view the case from their own standpoint and have a right to have the case

presented according to their views. If some of these may seem to repetitions, that is not to be considered in any way as attaching importance to them. * * *

" I charge you as matter of law that, in order for you to find the defendant guilty of gross or subsequent negligence in this case, you must find that the defendant's engineer knew or should have known of the position of peril, if any, in which the plaintiff and her husband were, and thereafter failed to exercise ordinary care to avoid the accident. The defendant's engineer was not required in this case to check the speed of his train or to take means to stop it until he was chargeable with clear notice that the horses and the plaintiff and her husband were in a position of peril and could not get out of the way and avoid an accident before the engine reached them. Under the undisputed evidence in this case, the defendant cannot be held liable for any gross or subsequent negligence on account of the use by it of an engine with a defective brake. That means that simply the use of that brake at the time, if it was defective, does not charge the defendant with being guilty of subsequent negligence; but the question was whether or not, with the brake in the condition that it then was, the defendant's engineer could have stopped the train and avoided the accident. If you find from the evidence in this case that the wagon in which the plaintiff was riding came upon the crossing suddenly and in such close proximity to the engine that the accident was either unavoidable or the engineer was not guilty of any gross or subsequent negligence, plaintiff cannot recover. I further charge you that under the undisputed evidence in this case that you must find that the bell upon the engine was ringing at the time of the accident and for some time prior thereto. I charge you as a matter of law that the lack of a signboard, flagman, electric bell, gates, or other notice of warning of a railroad crossing, or protection or safeguards at the same, was not the proximate cause of the accident in this case, and cannot be considered by you in arriving at your verdict.

" I charge you as a matter of law that the mere fact that an accident occurred in which the plaintiff was injured is not proof of negligence on the part of the defendant, and does not even raise a presumption that the defendant was guilty of any negligence in this case. I charge you as a matter of law that there is no evidence in this case that the defendant's train was running at an un-

due, improper, illegal, or excess rate of speed, and there is no evidence in this case that the emission of steam from the engine was improper or negligent. It is the duty of the engineer to see that the track ahead of him is clear of obstruction, but the proximity of the Fike team to the railroad track would not of itself be sufficient reason to require him to stop his train. The fact that the plaintiff was injured is not evidence that the defendant is guilty of any negligence that would make it liable in damages; the fact of the injury does not prove that the defendant is liable.

"I charge you that in considering this case you must only consider the evidence introduced in court, and must determine the case as between the parties without sympathy, prejudice, or passion. Having heard all of the testimony in this case, if you are unable to determine by a fair preponderance of the testimony that the defendant was guilty of subsequent negligence or gross negligence, then your verdict must be for the defendant. I charge you that you should not disregard the testimony of the operators of the train, or other of defendant's witnesses, through prejudice or caprice, or without cause, merely for the reason that they are in the employ of the defendant company."

No time need be spent in considering the first and second reasons for reversal stated by defendant's counsel, because the trial court charged the jury that the plaintiff and her husband were both guilty of contributory negligence in driving upon the track, and that the negligence of the husband was imputable to the plaintiff.

Even if the plaintiff was guilty of gross negligence in driving upon the track, that fact was not necessarily controlling of the case. We are of opinion that it cannot be said, as matter of law, that she was guilty of contributory negligence in not attempting to escape or jump from the wagon, under the circumstances of the case.

The third, fourth, and fifth reasons urged for reversal may be considered together, and they present the important question in the case. Was a case for the jury, on the ground of subsequent negligence of the defendant, made

out by the plaintiff ?    If so, contributory, antecedent negligence of the plaintiff is not a bar to recovery.

In Cooley on Torts, at page 674, the true doctrine is stated in the following language:

"If, therefore, the defendant discovered the negligence of the plaintiff in time, by the use of ordinary care, to prevent the injury, and did not make use of such care for the purpose, he is justly chargeable with reckless injury, and cannot rely upon the negligence of the plaintiff as a protection.   Or it may be said that in such a case the negligence of the plaintiff only put him in a position of danger, and was, therefore, only the remote cause of the injury, while the subsequently intervening negligence of the defendant was the proximate cause."

See, also, 29 Cyc. p. 496.

The same rule is stated in 7 Am. & Eng. Enc. Law (2d Ed.), at page 437, as follows:

"And notwithstanding negligence upon the part of the person injured, he may recover if the railway company, after such negligence occurred, could, by the exercise of ordinary care, have discovered it in time to have avoided inflicting the injury."

See cases cited in the note, including *Donohue* v. *Railway Co.*, 91 Mo. 357 (2 S. W. 424, 3 S. W. 848), in which it was said:

"Counsel indulges in a criticism of the cases in which this court has held that if the negligence of a defendant, which contributed directly to cause the injury, occurred after the danger in which the injured party had placed himself by his own negligence, was, or by the exercise of reasonable care might have been, discovered by the defendant in time to have averted the injury, then defendant is liable, however *gross* the negligence of the injured party may have been in placing himself in such position of danger.   Such is the well-established doctrine of this court."

This rule is well stated by Justice MONTGOMERY in *Richter* v. *Harper*, 95 Mich., at page 225 (54 N. W., at page 769), as follows:

" It is true that the contributory negligence of the plaintiff does not prevent recovery in a case where the defendant, who knows, or ought by the exercise of the most ordinary care to know, of the *precedent* negligence of the plaintiff, by his *subsequent* negligence does plaintiff an injury. *Battishill* v. *Humphreys,* 64 Mich. 514 [38 N. W. 581]; *Railroad Co.* v. *Mann,* 107 Ind. 89 (7 N. E. 893); Cooley on Torts, 674."

After quoting the language of that author as quoted by us above, he continues:

"This rule does not permit recovery, notwithstanding plaintiff's contributory negligence, but it recognizes that such discovered negligence of plaintiff, or his negligence which should have been discovered, is not a contributing cause to the injury in a legal sense.    This, we think, is the logical statement of the rule as deduced from the authorities."

In *Labarge* v. *Railroad Co.,* 134 Mich. 139, on page 145 (95 N. W. 1073), Chief Justice HOOKER, after reviewing the Michigan cases, said:

"In all of these cases the negligence of the defendants occurred when there was a condition of danger, and it may be said that it was unimportant how such antecedent condition arose, or whether it was due to the negligent act of the plaintiff or not.    The defendant's wrong being a want of ordinary care, which care would have prevented the accident notwithstanding plaintiff's antecedent negligence, it was responsible for it, and plaintiff's antecedent negligence being at most a remote cause, and there being no other negligence on the part of the plaintiff, he might recover.    It has in some cases been said that his negligence might be said to be a remote, and not the proximate, cause.    *    *    *    Whenever the defendant sees a plaintiff in danger, or by exercising only ordinary care in the discharge of his duty should discover such danger, in time to avert an injury, and either fails, after discovering it, to take steps to avert it, or fails to discover the danger, the fact that the plaintiff's danger arose, in the first place, through his own negligence, does not prevent his recovery for an injury sustained."

See, also, the language of Justice LONG in *Montgomery* v. *Railway Co.,* 103 Mich., at page 54 (61 N. W. 546,

29 L. R. A. 287), where reference is made to the case of *Richter* v. *Harper, supra,* and the Missouri cases:

"The cases do not attempt to define these acts as gross negligence, but place the right of recovery upon the ground that the proximate cause of the injury is the act of the defendant."

In *Bladecka* v. *Electric Co.,* 155 Mich. 253 (118 N. W. 963), the trial court charged the jury, among other things, that, if they found that plaintiff's dangerous position and situation was apparent to the motorman in charge of the defendant's car—

"For a sufficient length of time to enable said motorman to stop his car and avoid running into plaintiff, and that said motorman, instead of stopping his car, negligently allowed the same to run upon and into said plaintiff while she was in the position aforesaid, and injured her, then the defendant is liable in this case, even though you should find that the plaintiff or her husband were originally negligent in driving into said dangerous position."

This court held that the charge was clearly correct, and affirmed a judgment for the plaintiff. Many more cases might be cited to the same effect, but we desist for want of space.

Counsel for appellant, in their brief, state the rule as follows:

"It is gross negligence where the wrongdoer, by the exercise of the most ordinary care, should have known of the precedent negligence of the plaintiff and of his peril, and subsequently does him an injury. Baldwin on Personal Injuries, § 138. Gross negligence, therefore, may be: (*a*) A deliberately wilful act; (*b*) an act so reckless as to be akin to wilful, and therefore presumed in law to be wilful; (*c*) a failure to exercise ordinary care to prevent injury to another, after his peril is, or should have been, discovered in the exercise of ordinary care. Such failure to exercise ordinary care to prevent injury is so reckless that the law presumes it to be wilful; wilfulness or deliberate intent may be inferred from all of the circumstances—citing cases.

"If the claim of the plaintiff presents a case of gross negligence at all, it is under subdivision ' *c* ' of the definition above given."

Whether plaintiff was in a position of danger a sufficient length of time to have been seen by defendant's engineer, and to have enabled him to stop the train, was a question for the jury, and we think that question was properly submitted to them, in the language of the charge which we have quoted.

The distance within which the train could have been stopped, under the circumstances, including the condition of the engine when the emergency brake was applied, and the claimed fracture of the packing leather; the effect of such fracture upon the driving wheels of the engine, and upon the train—these were all questions of fact for the jury to consider, and were properly submitted to them. It *will be noted* that the engineer nowhere claims that he thought the team would get off the track before he reached it, but he says he did not see it.

Was the verdict against the weight of the evidence? Proper consideration of this question has rendered it necessary for us to read and consider the entire evidence in the case.    This we have done.

We said, in *Gardiner* v. *Courtright*, 165 Mich. 54 (130 N. W. 322), after a review of the decisions of this court, that we would only reverse a case upon the question of the weight of the evidence, when the verdict was against the overwhelming weight of the evidence; and that the verdict must be clearly against the great weight of the evidence, to require this court to overrule the decision of the circuit judge refusing a new trial.    In view of this well-established rule, we cannot say that a verdict for the plaintiff in this case was against the weight of the evidence, or that the circuit judge erred in denying the motion for a new trial upon that ground.

Was the verdict excessive in amount?

The plaintiff, a housewife of a common laborer, of the

age of about 37 years at the time, sustained serious injuries. She lost her left hand, the left arm being amputated about the middle third. The left foot was crushed, and had to be amputated above the ankle. There was a disfiguring scalp wound over the left forehead above the eye. She also sustained a nervous shock, which it is claimed will be permanent. She suffers from sleeplessness, and is affected with melancholy. She suffered severe pain. The elements of compensatory damages in such a case are well stated in *Sherwood* v. *Railway Co.*, 82 Mich., at page 383 (46 N. W. 773). Appellant's counsel state in their brief that:

"The record discloses, and it is proper to have in mind, that the plaintiff's husband was killed in the same accident in which she sustained the injuries sued for."

Certainly we cannot consider any elements of damage there may be pertaining to his injury or death in this action. The fact, however, remains that the plaintiff is a widow, and not a married woman. We are, however, impressed with the fact that the verdict and judgment in this case are excessive. At the time of the injury the plaintiff's expectation of life was about 30 years, as shown by the table of mortality. The sum of $17,000 placed at interest at 5 per cent. would bring an income of $850 a year, and at 4 per cent. would bring an income of $680 a year, without the impairment of any of the principal sum. We cannot overlook the fact that from $50 to $70 a month would bring to this plaintiff, in her station in life, a support that would be equal to her wants, and equal or greater than she could earn if uninjured. If in the later years of her life she should need to use some part of the principal sum, that fact would not be inconsistent with the rule of compensatory damages. It is not the object of the law in such a case to provide the plaintiff with a competency, or a fortune; but compensation for all the injury sustained is the rule.

We have examined the claim of improper argument of

counsel.    In view of the recent rulings of this court which are collected in *People* v. *Sartori*, 168 Mich., at page 317 (134 N. W. 200), we must hold that, except upon the measure or amount of damages, no question is preserved for review.

Other assignments of error, not here specifically treated, have all received careful consideration, and we find no prejudicial error except as indicated in the amount of the verdict.    Unless the plaintiff shall within 30 days from the filing of this opinion remit all damages in excess of $17,000 and interest from the date of the judgment, the judgment will stand reversed and a new trial be granted, with costs to appellant.    In case such excess is remitted as above indicated, the judgment of $17,000 and interest will stand affirmed, with costs of the court below.    In either event the defendant will recover its costs in this court.

STEERE, C. J., and MOORE, KUHN, OSTRANDER, and BIRD, JJ., concurred.

BROOKE, J.    If the liability of the defendant is established, as my Brethren believe, I am of opinion that the judgment should be affirmed.

McALVAY, J.    I think the judgment should be reduced to $12,500.